Harold **MACOMBER**, Plaintiff,

v.

**DIGITAL EQUIPMENT CORPORATION,**
Defendant.

Civ. No. 92–75–M.

United States District Court,
D. New Hampshire.

Sept. 19, 1992.

William J. Barron, LaFlamme, Migliori, Barron & Chabot, Haverhill, MA, for plaintiff.

Charles R. Parrott, Nutter, McClennan & Fish, Boston, MA, for defendant.

## ORDER

McAULIFFE, District Judge.

Harold Macomber brought this suit against his former employer, Digital Equipment Corporation, asserting various state law causes of action. He seeks to recover unpaid severance benefits that were allegedly promised to him by his supervisor, Robert DiGregorio. Jurisdiction is based upon diversity of citizenship and an amount in controversy which exceeds $50,000.00. 28 U.S.C. § 1332.

Digital moves for summary judgment and dismissal of Macomber's complaint, arguing that his state law claims—breach of contract (Count I), breach of an implied covenant of good faith (Count II), and negligent misrepresentation (Count IV)—are all preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.[1] Digital further argues that even if Macomber's claims are not preempted by ERISA, the uncontroverted facts establish that Digital is entitled to judgment as a matter of law.

In ruling upon Digital's motion, the court must initially determine whether the severance benefit package allegedly promised to Macomber qualifies as a benefit "plan" as defined by ERISA.[2] If the severance benefit package constitutes an ERISA plan, the court must then determine whether Macomber's state law claims are preempted by ERISA.

For the reasons set forth below, the court concludes that the severance benefit package offered by Digital to its employees and allegedly promised to Macomber does constitute an employee welfare benefit plan within the meaning of ERISA. And, although Macomber's claims are founded upon conduct alleged to have occurred prior to the adoption of the plan, those claims are nonetheless preempted by ERISA.

## I. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling upon a party's motion for summary judgment, the court must, "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990).

The moving party has the burden of initially demonstrating the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), *motion denied,* 480 U.S. 903, 107 S.Ct. 1343, 94 L.Ed.2d 515 (1987). If the moving party carries its burden, the non-moving party must set forth specific facts showing that there remains a genuine issue of material fact for trial, demonstrating "some factual disagreement sufficient to deflect *brevis* disposition." *Mesnick v. General Electric Co.,*

---

1. Plaintiff originally pleaded a fraudulent misrepresentation count (Count III), which he subsequently withdrew in his Memorandum In Opposition To Defendant's Motion For Summary Judgment (document no. 39).

2. Macomber suggests that this court previously ruled that Digital's severance plan is not an ERISA-governed employee welfare benefit plan, and that that ruling is now the "law of the case." The court disagrees. In its earlier ruling on Digital's motion for judgment on the pleadings, the court (J. Kelleher) specifically noted:

> The Court emphasizes that its ruling here is quite limited. The Court determines nothing more than that the TFSO *could* be found to be a single extension of benefits. Although the TFSO may eventually be found to be an employee benefit plan, the facts [presently available to the court] do not conclusively establish this as a matter of law.

Order, at 10 (April 30, 1993) (emphasis in original). Judge Kelleher's order does not preclude reexamination of the issue, particularly in light of the fact that far more information about the plan is now available (in the form of affidavits, a copy of the plan, etc.).

950 F.2d 816, 822 (1st Cir.1991), *cert. denied*, ——— U.S. ———, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). "In this context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one 'that might affect the outcome of the suit under the governing law.'" *United States v. One Parcel of Real Property with Bldgs.*, 960 F.2d 200, 204 (1st Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but the [non-moving] party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## II. Relevant Facts

The following facts are taken from Macomber's stipulation of uncontested facts, as set forth in his pretrial statement (document no. 28), and the uncontroverted representations contained in the affidavits submitted by Digital in support of its motion for summary judgment.

Macomber was an at-will employee of Digital from April 18, 1978 until he resigned, effective September 1, 1989. During the two years immediately prior to leaving, Macomber worked as one of approximately 12 people on the management staff of the Digital plant in Salem, New Hampshire. In November, 1988, Digital announced that the Computer Systems Manufacturing ("CSM") group located in the Salem facility would be replaced by another group, then located in Nashua, New Hampshire. Digital announced that the CSM jobs at the Salem facility, including Macomber's, would be eliminated. Robert DiGregorio, manager of the Salem plant, assumed responsibility for the Transition Management Program, a program initiated by Digital to facilitate the process of finding new jobs for CSM employees, like Macomber, whose jobs were being eliminated.

Macomber was a highly rated and highly valued employee of Digital. He was confident that, because of his status with the company, he would have little trouble finding a new job within Digital. Nevertheless, Macomber also began exploring job opportunities outside Digital. By letter dated July 21, 1989, Macomber was offered a position with Combustion Engineering, Inc., of Windsor, Connecticut. By its terms, Combustion's offer would expire on July 28, 1989, unless accepted by Macomber before that date.

Meanwhile, Digital had begun exploring the possibility of offering a financial separation package to CSM employees who voluntarily resigned. In late July, 1989, Macomber spoke with plant manager Digregorio about the offer he had received from Combustion Engineering and the possibility that Digital might offer severance benefits to employees who voluntarily left Digital's employ. Macomber acknowledges that during the meeting DiGregorio called his own supervisor's office to inquire about the status of the severance plan. Macomber concedes that DiGregorio told him that a severance plan had not yet been approved by Digital's board of directors and "that the package could not be offered to [Macomber] before it was offered to other employees." Plaintiff's Stipulation of Uncontested Facts, para. 13. Macomber claims, however, that DiGregorio privately assured him that Digital would announce the existence and terms of the severance plan on August 9, 1989 and that he would be eligible for benefits under that plan.

Believing that he would qualify for benefits under the yet-to-be-announced severance plan, Macomber accepted the position with Combustion Engineering and put his home up for sale. On August 5, 1989, Macomber signed a purchase and sale agreement and tendered a $5,000.00 deposit toward the purchase of a new home in East Granby, Connecticut.

To Macomber's surprise and disappointment, on August 9, 1989, DiGregorio announced to the CSM employees that no severance package had yet been approved by the board of directors. Macomber claims, however, that DiGregorio continued to privately assure him that a plan would be approved and that he would be eligible to participate in it. Subsequently, on August 29, 1989, Macomber met with Lou Gaviglia, Digi-

tal's Vice President of U.S. Manufacturing. Gaviglia told Macomber that a separation package was not available as of that date.

Despite knowing that a severance plan had not yet been approved by Digital's board of directors, and in apparent reliance upon the representations allegedly made to him by DiGregorio, Macomber tendered his resignation from Digital on August 29, 1989, effective September 1, 1989. On September 12, 1989, Digital announced a separation package, called the Transition Financial Support Option ("TFSO"), which was to become effective on October 9, 1989.[3] Macomber claims that statements made by DiGregorio caused him reasonably to believe that: (i) the Digital board of directors would approve a severance plan; and (ii) despite his resignation from Digital prior to any formal announcement regarding the nature, scope and eligibility requirements of the severance plan, he would be eligible for benefits under the plan. When Macomber subsequently applied for severance benefits under the TFSO, Digital ruled him ineligible, citing his voluntary resignation prior to the plan's effective date of October 9, 1989.

### III. Analysis

#### A. Is the TFSO an Employee Benefit Plan Under ERISA?

 Section 514 of ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). Thus, if Macomber's state common law claims "relate to" an "employee benefit plan," they are preempted by

ERISA. The definition of employee benefit plan set forth in ERISA provides little practical guidance to the court in resolving the issues presented by this case.[4] Nevertheless, there is no dispute that severance benefit plans may, under certain circumstances, constitute employee benefit plans within ERISA's meaning. *Panto v. Moore Business Forms, Inc.*, 676 F.Supp. 412 (D.N.H. 1988).

As the Supreme Court noted in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the focus of an inquiry into whether a severance plan constitutes an ERISA-regulated employee welfare benefit plan must be the level of administrative obligations imposed upon the employer by the plan:

> Congress intended preemption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligations. It is for this reason that Congress pre-empted state laws relating to *plans*, rather than simply to *benefits*. Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation.·

*Id.*, at 12, 107 S.Ct. at 2218 (emphasis in original). Thus, as the Court of Appeals for the Eight Circuit has noted:

> The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to adminis-

---

3. Macomber suggests that he was wrongfully induced to resign effective September 1, 1989, and to accept four weeks' pay in lieu of giving the four week notice of his resignation, as was required by Digital's corporate policies. Nevertheless, even if Macomber had given four weeks' notice and remained an employee of Digital until October 1, 1989, he still would not have qualified for participation in the TFSO. Only those individuals employed by Digital on October 9, 1989, and deemed to be otherwise qualified, were eligible to participate in the TFSO.

4. ERISA defines "employee welfare benefit plan" and "welfare plan" as:

 any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance of otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

ter the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria.

*Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 257 (8th Cir.1993).

Recently, the Court of Appeals for the First Circuit addressed this issue in *Simas v. Quaker Fabric Corp.,* 6 F.3d 849 (1st Cir. 1993). There, the Court considered whether a Massachusetts "tin parachute" statute required employers to establish an employee benefit plan.[5] If the state statute were deemed to mandate the establishment of an employee benefit plan, it would be preempted by ERISA.

Noting that the Massachusetts statute imposed upon employers "ongoing administrative obligations, . . . of a kind and over a time period, that go far enough beyond *Fort Halifax* to call the regime a 'plan' within the meaning of ERISA," the court held the statute to be preempted. *Id.,* at 853. Specifically, the Court noted that the statute required the employer to evaluate each individual's employment situation and to determine whether he or she qualified for unemployment benefits under state law, in deciding eligibility for the severance benefit provided. The nature and magnitude of the administrative obligations imposed upon an employer by the statute, were sufficient to qualify the statutory scheme as one "related to" an ERISA benefit plan.

Similarly, in *Bogue v. Ampex Corp.,* 976 F.2d 1319 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993), the Court of Appeals for the Ninth Circuit was called upon to interpret the "ongoing administrative program" standard established by the Supreme Court in *Fort Halifax.* There, a company which was considering the sale of a subsidiary created a severance benefit plan to encourage the executives of the subsidiary to remain in its employ. The plan provided that if the subsidiary were sold and if the executives were not offered "substantially equivalent employment" by the subsidiary's purchaser, they would be provided with severance benefits. Applying the test articulated in *Fort Halifax,* the court noted that "the program, by its own terms, required the sort of discretionary decision-making by the plan's administrator that is the hallmark of an ERISA plan." *Bogue,* 976 F.2d at 1322–23. Thus, because the severance program could not be administered without the type of administrative scheme characteristic of an ERISA plan, the court concluded that the plan was governed by ERISA.

Other courts have reviewed severance benefit "plans" under the standards established in *Fort Halifax* and concluded that the level of administrative burdens imposed upon an employer were not of sufficient magnitude to warrant the conclusion that the programs were governed by ERISA. *See, e.g., Fontenot v. NL Industries, Inc.,* 953 F.2d 960 (5th Cir.1992); *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530 (3d Cir.1992).

■ Although one cannot pinpoint with mathematical precision the line distinguishing employee benefits governed by ERISA from those which are not, the guidelines established by the Supreme Court as applied by the Courts of Appeal lead to the conclusion that Digital's TFSO program constitutes an employee welfare benefit plan within ERISA's reach. By its very terms, the TFSO imposed upon Digital administrative burdens of a magnitude and for a time-period that warrant characterizing it as a "plan" under ERISA.

Digital employed the equivalent of 10 full-time employees to administer the TFSO. The administrators were required to determine which employees were eligible for participation in the plan and to educate eligible employees about the nature and scope of the

---

**5.** The Massachusetts "tin parachute" statute required employers to make a one-time severance payment to employees who: (i) had worked a minimum of three years for the employer; (ii) lost their jobs as a result of a "transfer of control" of their employer; and (iii) met the eligibility standards for unemployment benefits under state law. Mass.Gen.L. ch. 149, § 183.

plan. The latter task involved organizing and running of a series of educational meetings regarding the TFSO and the publication and distribution of an informational booklet and a series of written questions and answers concerning the TFSO. Apart from educating its employees about the terms of the TFSO, the administrators had to determine which of Digital's approximately 125,000 employees qualified for participation in the program.

In order to qualify for participation in the TFSO, an employee had to be: (i) deemed "in transition" by Digital's Cross Organization Committee; (ii) "available" for participation in the TFSO by not having found another job within Digital's corporate structure; and (iii) employed by Digital as of October 9, 1991. Essentially, an employee was "in transition" if the committee concluded that his or her position was significantly and adversely impacted by downturns in business and/or work consolidations. Additionally, in determining which employees would be designated "in transition," the administrators were required to conduct reviews of each employee's performance records and time spent on the job. Thus, if faced with deciding which one of two employees would be deemed "in transition," administrators would follow a set of established procedural guidelines. Application of this case-by-case review of Digital's employees yielded the determination that 551 of Digital's approximately 125,000 employees were "in transition" and eligible for participation in the TFSO. Of those 551 employees, 231 remained "available" to participate and ultimately elected to participate in the plan.

Here, as in *Simas v. Quaker Fabric Corp., supra,* the administrative obligations undertaken by the employer in an effort to manage and implement the severance benefit program were of a sufficient magnitude, duration and nature to warrant finding that Digital's TFSO constitutes an employee welfare plan within the meaning of ERISA. Among other things, in determining who was eligible to participate in the TFSO, Digital was required to "analyze each employee's particular circumstances in light of the appropriate criteria." *Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d at 257.

## B. Are Plaintiff's State Law Claims Preempted?

Having determined that Digital's TFSO is an employee welfare benefit plan under ERISA, the court must next determine whether Macomber's state common law claims "relate to" that plan.

The TFSO was available to qualifying individuals who were employed by Digital as of October 9, 1989. Because Macomber resigned effective September 1, 1989, there can be no dispute that he is not facially eligible to participate in and is not a beneficiary of the TFSO. Macomber acknowledges as much, and his complaint does not assert any rights to TFSO benefits *as such.* Rather, Macomber seeks damages stemming from alleged misrepresentations made to him, upon which he relied to his detriment, which ultimately caused him to act in a manner that precluded him from participating in the TFSO. Simply stated, Macomber argues that but for Digital's wrongful conduct *prior to the adoption of the plan,* he would have made decisions and taken action to remain eligible for and to benefit from the TFSO. Accordingly, he argues that because the acts of which he complains occurred prior to the adoption of the plan, ERISA does not preempt his state law causes of action.

Federal courts appear divided on the issue of whether ERISA preempts state law claims relating to allegedly wrongful conduct predating the adoption of an ERISA plan. *Compare Perry v. P\*I\*E Nationwide,* 872 F.2d 157 (6th Cir.1989) (common law claim of fraud in the inducement in obtaining participation in an employee welfare benefit plan and seeking rescission of plan, but *not* seeking benefits under plan, is not preempted by ERISA), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1068 (1990); *Perkins v. Time Insurance Co.,* 898 F.2d 470 (5th Cir.1990) (state law claim against insurance agent for fraudulent inducement is not preempted by ERISA, while similar claim against insurance company is preempted); *Martin v. Pate,* 749 F.Supp. 242 (S.D.Ala. 1990) (claim of fraud in the inducement not preempted by ERISA), *aff'd without op.* 934 F.2d 1265 (11th Cir.1991); *Isaac v. Life Investors Ins. Co.,* 749 F.Supp. 855 (E.D.Tenn.

1990) (same); *with Farlow v. Union Central Life Ins. Co.*, 874 F.2d 791 (11th Cir.1989) (claim of fraud in the inducement preempted by ERISA); *Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d 1272 (6th Cir.1991) (state law claim of promissory estoppel to recover benefits from plan preempted by ERISA), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 2, 120 L.Ed.2d 931 (1992).

In *Perry v. P\*I\*E Nationwide, Inc., supra,* the Sixth Circuit Court of Appeals held that a state law claim alleging fraud in the inducement and seeking rescission of the plan is not preempted by ERISA. The court noted that "we are disposed ... toward the reasoning ... that preemption should apply to a state law claim only if Congress has provided a remedy for the wrong or wrongs asserted." *Perry*, 872 F.2d at 162. Other circuit courts of appeal have, however, disagreed that the lack of a federal remedy provides a basis upon which to ground a finding of non-preemption. *See, e.g., Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d at 1276, *citing Caterpillar Inc. v. Williams,* 482 U.S. 386, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987); *Olson v. General Dynamics Corporation,* 951 F.2d 1123, 1128 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2968, 119 L.Ed.2d 588 (1992); *Scott v. Gulf Oil Corp.,* 754 F.2d 1499 (9th Cir.1985).

■ This court is persuaded by the opinions of the Sixth and Eleventh Circuits, that state law causes of action alleging wrongful conduct prior to the adoption of an ERISA plan *and* seeking benefits under the plan (or damages as measured by the benefits which would otherwise have been provided by the plan) are preempted by ERISA. *See Farlow v. Union Central Life Ins. Co.*, 874 F.2d 791 (11th Cir.1989); *Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d 1272 (6th Cir. 1991). In *Farlow*, the plaintiffs brought suit against an insurance carrier and its agent, alleging fraudulent misrepresentation and claiming that the agent negligently failed to disclose that the ERISA plan did not provide maternity and pregnancy coverage. Plaintiffs also alleged that the agent fraudulently induced them to discontinue their current insurance coverage in favor of participation in the Plan. Essentially, the plaintiffs ar-

gued that but for the fraudulent conduct of the agent, they would have retained their prior insurance coverage which provided maternity benefits. The Court of Appeals held:

[A] state law cause of action "relates to" an employee benefit plan if the employer's conduct giving rise to such claim was not "wholly remote in content" from the benefit plan.

. . . . .

[T]he conduct alleged in these claims is not only contemporaneous with Union Central's refusal to pay benefits, but the alleged conduct is intertwined with the refusal to pay benefits. Finding the [plaintiffs'] state law claims not wholly remote in content from the Union Central plan, we reject the [plaintiffs'] contention that simply because their claims involve misconduct in the sale and implementation of the Union Central plan, their claims do not relate to the plan. Consequently, we hold that ERISA preempts the [plaintiffs'] misrepresentation and negligence claims.

*Farlow v. Union Central Life Ins. Co. supra* at 794.

Here, the conduct about which Macomber complains, like that in *Farlow*, is not "wholly remote in content" from the plan. Thus, ERISA preempts Macomber's state common law claims. This conclusion is supported by the Court of Appeals' recent opinion in *Vartanian v. Monsanto Co.*, 14 F.3d 697 (1st Cir.1994).

In *Vartanian*, plaintiff alleged that he was denied a reasonable opportunity to make an informed decision about when to retire because his employer failed to disclose its intention to offer an enhanced severance benefit. Plaintiff claimed that on several occasions prior to his retirement he questioned his supervisor about the possibility of Monsanto's offering more favorable severance benefits than that applicable at the time he planned to retire. Plaintiff claimed that on each occasion he was told that Monsanto had no such intentions. Plaintiff retired on May 1, 1991. Subsequently, on June 28, 1991, Monsanto announced a revised and enhanced severance benefit program, available to em-

ployees who retired on or after December 1, 1991.

Much like Macomber in this case, *Vartanian* argued that if, in response to his questioning about the potential for a new severance benefit plan, he had been provided with truthful information, he would have delayed his retirement as necessary to insure his eligibility for the enhanced severance benefits.

Citing the Supreme Court's opinion in *Ingersoll-Rand, Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the *Vartanian* court noted that a state law cause of action "relates to" an employee benefit plan, and is therefore preempted by ERISA, if in order to prevail, the plaintiff must plead, and the court must find, that an ERISA plan exists. *Vartanian*, 14 F.3d at 700. The court concluded:

> In the present case, the existence of the 1991 Plan [in which plaintiff claims he would have participated, but for the alleged misrepresentations of Monsanto] is inseparably connected to any determination of liability under state common law of misrepresentation. There is simply no cause of action if there is no plan. The alleged misrepresentations by Monsanto relate to the existence of the 1991 Plan and in order to prevail under a state common law claim for misrepresentation, Vartanian would undoubtedly have to plead, and the Court would have to find, that the 1991 Plan exists. Thus, ... Vartanian's claims "relate to" an ERISA plan and are expressly preempted by ERISA.

*Id.*, at 700.

Likewise, here Macomber has no cause of action against Digital if there is no TFSO; the benefits allegedly promised to him were based upon his supervisor's representations of what the severance benefit plan would ultimately provide and who it would include. Thus, Macomber's claims necessarily "relate to" an ERISA plan and are expressly preempted. *See Vartanian v. Monsanto Co.*, 14 F.3d at 700; *Farlow v. Union Central Life Ins. Co.*, 874 F.2d at 794. Accordingly, Defendant's motion for summary judgment (document no. 31) is granted and plaintiff's

complaint is dismissed. Judgment shall be entered in accordance with this order.

SO ORDERED.