## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

### JAMES DICKERSON, ET AL. V. RONALD D. CONKLIN.

June 10, 1977.

Record No. 760239.

Present: All the Justices.

*Norman F. Slenker (John K. Coleman; Slenker, Brandt, Jennings & O'Neal,* on brief), for appellants.

*Warren Miller (Wyatt B. Durrette, Jr., Chess, Durrette & Roeder, on brief), for appellee.*

HARRISON, J., delivered the opinion of the Court.

Ronald D. Conklin filed two motions for declaratory judgment against James Dickerson and American Commercial Insurance Agency, Inc. In one motion he alleged that on or about November 9, 1973, Dickerson and Conklin entered into an agreement whereby Dickerson and his agency would obtain insurance for Conklin's cars, effective immediately, but had negligently failed to obtain the insurance. In the other motion Conklin alleged that Dickerson individually and as agent for Commercial entered into a contract agreeing to obtain insurance for Conklin's automobiles "with property damage and liability insurance", effective immediately, but had failed to obtain the insurance in breach of the contract.

The causes were consolidated for trial and resulted in the entry by the trial court of a final judgment order which

"ADJUDGED, ORDERED AND DECREED that the defendant, James Dickerson, acting personally and as an authorized agent, servant and employee of American Commercial Insurance Agency, Inc., did enter into an oral contract of insurance covering the automobiles of the Complainant under a usual automobile liability insurance policy with limits of $100,000/$300,000 coverage during the specific period of time from November 2, 1973, through and including November 16, 1973. . . ."

Appellants appealed, assigning numerous errors.

The factual background of this case must be given in some detail. In October, 1973, Conklin severed his relationship with the Dale Construction Corporation, and the agreement of separation, dated October 1, 1973, stipulated that Dale had previously transferred to Conklin title to a 1970 El Camino pickup truck and a 1971 Buick Electra which were then in Conklin's possession. Thereafter Conklin formed the Barkley Construction Company and was desirous of becoming the general contractor in constructing a Mormon Church in Fairfax County, estimated to cost approximately $1,500,000. Conklin had never previously obtained a payment or performance bond in

that amount, and it was necessary that he establish a relationship with some insurance agency which could procure for him the necessary bonding coverage. Accordingly, Conklin contacted Lawrence Ash of Alexandria, who operated an insurance and investment company, to determine if Ash could provide him with the insurance coverage he sought. Ash responded that he was not currently writing that type of insurance but that he "could provide an outlet for him". Ash recommended James Dickerson, a resident of Arnold, Maryland, who was the president of American Commercial Insurance Agency, Inc., a Maryland corporation. The business of the agency was writing all types of insurance for the insurance companies it represented, and Dickerson was licensed in Virginia as a nonresident broker.

Ash arranged a meeting which was held in Conklin's home in Fairfax County on or about November 2, 1973, and was attended by Ash, Dickerson and Conklin. It is agreed that the primary purpose of the meeting was to discuss bonding insurance for the Barkley Construction Company. Conklin and Dickerson, who had never met prior to the conference, both testified that the matter of the bond was first discussed; that Conklin supplied Dickerson with various information regarding his previous experience in the construction business, his financial status and property which he owned; and that Dickerson made notes of the information supplied and the documents examined. However, the evidence of what occurred and what was said relative to writing the liability insurance on the automobiles is in conflict.

Conklin admitted that after the parties had concluded their conversation regarding the bonding insurance he told Dickerson that he knew from past experience that whoever wrote his bonding insurance would want Conklin to give him other types of insurance, including liability insurance on automobiles and vehicles. Conklin testified that he told Dickerson that he did not have any liability insurance on his cars, was concerned about it and "would like to be covered right now". He said that Dickerson obtained the necessary information from the titles and registration cards and that "we talked about the amount and we talked about the payment. The amount was in the neighborhood of 300 and 100". Conklin said that Dickerson did not want a check from him at that time, "that when he put it together, he would send me a bill".

Conklin further testified that after Dickerson "had finished writing the information down that he needed on the vehicles, I asked Mr. Dickerson, am I covered as of right now? Mr. Dickerson said to me, as of right now you are covered". Conklin said that he again asked Dickerson, "are you sure I'm covered as of right now and he said yes". And further, that when Dickerson and Ash departed from his home, and as they were leaving, "I said to Mr. Dickerson, now, you're sure I'm covered as of right now? He said, yes you are". On cross-examination, Conklin testified that he could not remember the name of the company which was to issue the policy. He stated that there was no discussion as to the period of coverage, the amount of premium payments and when they would be due. He said that he could not remember any discussion regarding the types of coverage, such as collision, comprehensive and medical payment coverage; who the drivers of the vehicles would be; and other information relating to the risk to be insured.

Ash's version of the conference is that initially the parties "talked about the bonding and then went to automobile insurance but then back to bonding again after that I mean". He said that Conklin exhibited to Dickerson the registration and other documents on the two vehicles and that Dickerson "made some notes on pieces of paper". He recalled that Conklin "asked a question as to whether he was covered, could consider himself covered at the time. I don't remember the exact words, but something to that effect". Ash said that, while he did not remember Dickerson's actual words, "it was in the affirmative".

Ash testified that no application form was exhibited or filled out and that no money changed hands. He was unable to recall whether the parties discussed the amount of the coverage; the amount of the premium; the period of coverage; the users of the vehicles; the previous driving records of Conklin, his family or employees of his corporation; provisions for medical payments or uninsured motorists; and other information relevant to the risk to be insured. But Ash did say that "there was a lengthy discussion — lengthy conversation about auto insurance, no question about that". Ash said, with reference to the bond, that the only agreement Dickerson made was that he "would attempt to procure" the bond for Conklin.

Ash said that his initial contact with Dickerson was primarily for the purpose of getting a bond for Conklin, and that Dickerson

mentioned to him that if he provided the bonding service for a client "he normally would expect to write all of his casualty business; not only automobile insurance but other types of casualty business that a construction company normally becomes involved with".

Sherry Ann Conklin, who was sixteen years old at the time of the meeting and a daughter of appellee, was called as a witness. Although Dickerson, Ash and Conklin did not see her in the house during their conference on November 2, 1973, Sherry testified that she was in another room and "could see Mr. Dickerson and part of the table and some hands and things. That is all". It appears that two days before Conklin was to testify in this case he and his wife had a conference with his attorney, and upon their return home discussed what had taken place in the lawyer's office. Sherry testified that her mother said that "nobody remembered Mr. Dickerson answering whether or not my father was covered with insurance and I said that I heard it, remembered it. . . . I heard my father mention automobile insurance, but I don't remember what he said about it. But then I heard him say 'Am I covered as of right now?' and Mr. Dickerson said, 'Yes, you are covered right now.' And then my father said 'Right this minute?' And he said 'Yes, right this minute' ".

James Dickerson testified that prior to November 2, 1973, he had never seen Conklin and did not recall ever having met Ash. He said that a Mr. Caldwell, general agent for Bankers Life of Nebraska, had told Ash that Dickerson "could perhaps help him with the type of insurance he was looking for". Dickerson said that Ash informed him "that he had a client who was interested in obtaining payment and performance and bid bonds for contracts for construction"; and that Ash arranged their meeting with Conklin in the latter's house.

He testified that they were "just seeing what his [Conklin's] bonding capacity would be"; that Conklin stated that he would need bonding for between $1,000,000 and $1,500,000; and that he obtained information on Conklin's experience, the types of jobs in which he had been involved, his financial condition and that of his corporation and its officers. Dickerson said that he made no representation or commitment to Conklin as to the amount of bond that he could obtain.

Dickerson testified that they discussed automobile insurance "just in the most general of terms". He said he asked "what about the rest of his business insurance and he indicated to me at that time that I shouldn't worry about that. If I could provide the bonding, I would get everything". Dickerson denied that he ever agreed at any time that the automobiles would be insured or covered. He said, however, that preliminary to writing automobile liability insurance on behalf of a company he represented, a great deal of information would be needed regarding the applicant, type of vehicle to be insured, how it was to be used, who would use it, where the applicants lived and how they got to and from work. He said that he had automobile liability insurance application forms in his briefcase and would have accepted Conklin's application at that time, for "that was his business". He said that had he agreed to write the insurance, he would have given Conklin a binder or memo indicating "the type of coverage that I was binding and the effective date and put a receipt on there for the amount of binder deposit that I received".

Following the conference of November 2nd, and on the same day, Dickerson submitted the information that he had received from Conklin to the Maryland Casualty Company. The following day the company declined to write the bond. Dickerson said that he called Ash and told him that "Mr. Conklin was unacceptable for bonding purposes to Maryland Casualty Company. And he said he would be in touch with Mr. Conklin so I sent him the documents and forgot about it".

Dickerson further testified that a week or two later Ash called him and asked, "Did you bind automobile coverage for Mr. Conklin?" Dickerson said that his response was, "Of course not." Dickerson said he heard nothing further from either Ash or Conklin. It developed that on November 16, 1973, Conklin was involved in an accident while operating the Buick automobile. A few days thereafter Conklin's lawyer, Douglas E. Bywater, called Dickerson. Bywater testified that Dickerson told him that automobile liability insurance had been discussed at the November 2nd meeting, but Conklin did not ask him to write such insurance then, and it was not written.

We view the evidence in this case with full appreciation of the numerous decisions by this Court holding that where the evidence is in conflict, the judgment of a trial court thereon has

the same weight as the verdict of a jury. We are not at liberty to disturb such judgment unless it is clearly wrong or without evidence to support it.

The factual dispute in this case is a simple one. The issue was framed and narrowed in the lower court and appellee has not assigned cross-error. Appellants appeal a decision by the court below that an oral contract of insurance exists between them and Conklin, whereby they are the insurers of two vehicles of Conklin "under a usual automobile liability insurance policy with limits of $100,000/$300,000 coverage from November 2, 1973 through and including November 16, 1973".

We are therefore dealing with a question of contract. Admittedly an oral contract of insurance may be enforceable, either at law or in equity, if all essential elements are proven by clear and convincing evidence. *Walker Agcy. & Aetna Cas. Co.* v. *Lucas,* 215 Va. 535, 211 S.E.2d 88 (1975).

In *Haskin* v. *Agricultural Fire Insurance Co.,* 78 Va. 700, 707 (1884), the plaintiff sought specific performance of an oral contract of fire insurance. We there stated the standard of proof required as follows:

> "If the evidence is conflicting, and it is not clear that a contract was in fact made, a bill for specific performance will be dismissed. *Snydam* v. *Columbus Ins. Co.,* 18 Ohio 459; *Dinning* v. *Phoenix Ins. Co.,* 68 Ill. 414. The proof of the contract may be by parol, but it must be full and clear. And proof of a mere offer on the one hand, without acceptance on the other, or of an incomplete contract — that is, where anything is left open for future adjustment, either as to the amount of the risk, the premium to be paid, or the duration of the risk — no contract or obligation exists. *N.E. Fire and Marine Ins. Co.* v. *Robinson,* 25 Ind. . . ."

In *Meadows* v. *American Eagle Fire Ins. Co.,* 104 W. Va. 580, 583, 140 S.E. 552, 553 (1927), it was said:

> "There was no meeting of the minds, and consequently there is no contract. A contract of insurance, like any other contract, must be based on a mutual agreement.
>
> * * * * *
>
> "The fact that parties suppose they have agreed, when in reality they have not agreed as to an essential element of the

contract, does not affect the above rule. The minds of the parties must wholly meet, not partially meet. The agreement must be integral not fractional. The unity of the concordance must be reached by the parties, not imposed by the court. A court is no oracle to divine assent where assent is wanting. *Insurance Co.* v. *Young's Adm'r*, 23 Wall. 85, 107, 108, 23 L. Ed. 152." *Accord, Craft* v. *Inland Mutual Insurance Company*, 145 W. Va. 670, 116 S.E.2d 385 (1960).

In *Beam* v. *de la Burde*, 216 Va. 419, 219 S.E.2d 681 (1975), the plaintiff sought to recover from an insurance agent for breach of contract, alleging failure on the part of the agent to procure for the plaintiff the type of insurance that he had requested and which he and the agent had agreed would be furnished. We held that the plaintiff failed to carry the burden of proof necessary to establish the contract he alleged and its breach.

The judgment order in the instant case refers to "a usual automobile liability insurance policy". While there is no evidence in the record as to what constitutes a usual policy we assume the reference is to some species of the involved automobile liability policies issued by companies licensed in Virginia and operating under the laws of this state. Such policies contain innumerable provisions and clauses detailing the reciprocal agreements, duties and obligations of both insured and insurer.

The cases cited in appellee's briefs are by and large inapposite for they deal with insurance companies and the failure on the part of an agent of such a company to provide the insurance he undertook and had the authority to provide. Most often the controversies arose out of the failure of an agent to renew a specific policy, or the failure of an agent to provide a specific type of coverage allegedly agreed upon. In the instant case the inquiry is what, if anything, did Conklin and Dickerson "agree upon and contract for". No insurance company is involved here. Appellants are merely agents and the corporate appellant is a mere insurance agency. Code § 38.1-333 provides that an insurance policy or contract shall specify:

"(1) The names of the parties to the contract;

"(2) The subject of the insurance;

"(3) The risks insured against;

"(4) The time at which the insurance thereunder takes effect, and, except in the case of group insurance, title insurance, and

insurance written under perpetual policies, the period during which the insurance is to continue;

"(5) A statement of the premium, except in the case of group insurance and title insurance; and

"(6) The conditions pertaining to the insurance."

We find no evidence that at the November 2, 1973 conference there was a meeting of the minds of Conklin and Dickerson as to the essential terms and provisions of any automobile liability policy.[1] There was evidence that the vehicles were uninsured, a mention of policy limits, and testimony by the appellee that he was assured that he would be covered immediately. Significantly there was no testimony as to what persons were to be the insureds under the policy; or whether the vehicles were to be titled in Conklin's name or in the name of Barkley Construction Company. No one testified whether the policy was to be a family automobile contract, and if so, who was to operate the vehicles, whether adults or minors; or whether the car was to be used in the construction business, and if so, the employees of the company who would be authorized to operate the vehicles; or whether the policy was to be a combination general liability policy in which all members of the Conklin family and all officers and employees of the Barkley Construction Company were to be the insureds. There was no testimony on the terms of the coverage; or whether the policy was to include collision and comprehensive insurance, medical payments or would protect against uninsured motorists. The period of the policy was not agreed upon.

We find no evidence to indicate how much the liability insurance was to cost Conklin. The amount of the premium would necessarily depend upon many factors on which no testimony was introduced, including policy period, extent of coverage, uses to which the vehicles were to be put, who the drivers were to be, including their ages, sexes and driving records.

Accordingly, we find no clear and convincing evidence that there was a meeting of the minds of Conklin and Dickerson on

---

[1] While Code § 38.1-332 specifically permits oral binders of temporary insurance, as a general rule, the parties must normally agree upon provisions such as those required by Code § 38.1-333. Under certain circumstances, some of these elements may be supplied by inference. Annot., 12 A.L.R.3d, 1304, 1307-08 (1967); 43 Am.Jur.2d, *Insurance* § 202 (1969).

the essential elements necessary to create a contract of automobile liability insurance on the vehicles owned by Conklin. For affirmation in this case to be meaningful and to provide the parties with an enforceable contract, we would have to supply virtually every essential element of a liability insurance contract other than possibly the maximum personal injury limits, and this the Court is without authority to do.

Having concluded that appellee's case fails for want of an enforceable contract, it is unnecessary that we discuss appellant's other assignments of error which also question the appellee's right to recover.

The order of the lower court is reversed, and final judgment will be entered for appellants.

*Reversed and final judgment.*