## Virginia Property and Casualty Insurance Guaranty Association

v.

## Archie Robinson

Record No. 921563

June 11, 1993

Present: All the Justices

*Frank E. Brown, Jr. (Mays & Valentine*, on briefs), for appellant.
*Thomas Fortune Fay (Denise J. Tassi*, on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

We must decide whether the plaintiff has a "covered claim" against an association, created under the Virginia Insurance Guaranty Association Act (the Act), "to provide a mechanism for the payment of covered claims under certain insurance policies . . . to avoid financial loss to claimants . . . because of the insolvency of an insurer." Former Code § 38.1-757 (1981).[1]

On November 6, 1981, Archie Robinson, a resident of Virginia, was injured in Maryland when a truck owned by Maislin Transport Company (Maislin) collided with Robinson's car. Maislin was a

[1] The Act, which previously consisted of Code §§ 38.1-756.1 to -774 (1981), was rewritten effective July 1, 1986, Acts 1986 ch. 562, and is now found at §§ 38.2-1600 to -1623 (1990 & Supp. 1992). This rewriting changed the name of the legislatively created association from the Virginia Insurance Guaranty Association to the Virginia Property and Casualty Insurance Guaranty Association. However, the substantive provisions of the code sections involved in this appeal were not amended.

motor freight common carrier with headquarters in LaSalle, Quebec Province, Canada. Robinson sued Maislin and recovered a $225,000 judgment in 1989. However, Robinson was unable to collect all of his judgment because of the insolvencies of Maislin and its excess liability insurance carrier.

Asserting that Carriers Insurance Company (Carriers), an Iowa insurance company authorized to do business in Virginia, had issued Maislin's excess liability insurance policy and, subsequently, had become insolvent, Robinson then sued the Virginia Property and Casualty Insurance Association (the Association) to recover that portion of his unsatisfied judgment payable under the Act.

Relying upon the provisions of former Code §§ 38.1-760(4) and 38.1-760(5), the Association defended on the ground that Robinson did not have a claim covered by the Act because Maislin's excess insurance liability policy had not been "issued" by an "insolvent insurer . . . authorized to transact insurance in [Virginia].[2] Rather, the Association contended that the policy had been issued by United Canada Insurance Company (United), a wholly owned subsidiary of Carriers that was *not* authorized to do business in Virginia. United apparently delivered this policy to Maislin Industries Ltd., the parent corporation of Maislin, with Maislin listed as an additional insured in Endorsement No. 1. Because Carriers *was* authorized to do business in Virginia and Carriers had treated the policy of United "in all respects as its own," the court found Carriers had "issued" the policy.

As both companies had been declared insolvent and apparently neither had any assets available to pay any part of Robinson's claim, the court concluded that Robinson had a "covered claim" under the Act. Accordingly, the court entered judgment against the Association for $164,900, the agreed limit of Robinson's claim against the Association. The Association appeals.

[2] Former Code §§ 38.1-760(4) and 38.1-760(5) (both now part of Code § 38.2-1603) provided in pertinent part:

"Covered claim" means an unpaid claim . . . which arises out of and is within the coverage . . . of an insurance policy to which this chapter applies *issued by an insurer*, if such insurer becomes an insolvent insurer.

Former Code § 38.1-760(4) (emphasis added).

"Insolvent insurer" means . . . an insurer *authorized to transact insurance in this State* either at the time the policy was issued or when the insured event occurred.

Former Code § 38.1-760(5) (emphasis added).

There is no evidence that Carriers was a successor in title to United. Therefore, the question in this case is whether Carriers "issued" Maislin's policy so as to give it a "covered claim" within the meaning of former Code § 38.1-760(4).

In *Homestead Fire Ins. Co. v. Ison*, 110 Va. 18, 23, 65 S.E. 463, 465 (1909), we noted a dictionary definition of the term "issuance" as "the act of putting, sending or giving out," and the "legal definition" as "to send out officially; to deliver for use; to put into circulation." *Id.* The word "issue" has the same connotation: "[t]o send forth; to emit; to promulgate; as, an officer issues orders, process issues from a court. To put into circulation; as, the treasury issues notes. To send out, to send out officially; to deliver, for use, or authoritatively." Black's Law Dictionary 830 (6th ed. 1990).

■ With this definition in mind, we turn to the facts of this case. The policy in dispute and covering Maislin was originally issued by United to Maislin's parent corporation as United's policy No. 8290. However, the number "8" was deleted on the policy and the number "7" inserted in its place, making the policy number "7290." The date of issuance is not shown on the policy, but the policy was effective January 1, 1981, and continued in effect on the date of Robinson's injury. Coverage Clause 4 provided "Excess Liability Insurance over and above the Schedule of Underlying Insurance outlined therein."

United is the only insurance company described in the policy with the exception of two of the eighteen endorsements placed on the policy before Robinson was injured.[3] However, neither of these two endorsements affected Maislin's liability coverage.

■ On December 18, 1980, 14 days before the policy at issue became effective, Carriers certified to the Interstate Commerce Commission (ICC) that it had issued its liability insurance policy No. 7290 to Maislin. However, Paul D. Turner, the only witness in this case who had been employed by Carriers prior to its insolvency, testified that no such policy had been issued by Carriers. Noting that Maislin's trucks were insured by United for operations both in Canada and the United States, Turner testified that Carriers' ICC certification was necessary because the ICC required "a certificate from some United States insurance company stating that the insured has . . . the insurance required by their regulations."

---

[3] Robinson agrees that we should not consider those policy endorsements that were issued after the date of his injuries.

Stanley K. Stevens, whose employment in the claims department by Carriers' statutory liquidator began in 1987, testified that he struck out the number "8" on United's policy No. 8290 and inserted the number "7," making the policy number read "7290." Stevens did this because when Carriers "made filings in the United States for Maislin, their filings went out under 7290." Stevens testified that the method of operation between United and Carriers was

that any policy that is written out of United Canada and where [Maislin] had trucks running in the United States . . . [a]ll the filing procedures and requirements were done by Carriers personnel, but they would not file it under 8290 because that policy would be cover[ed by an insurer] in Canada, which wouldn't be licensed to do business in the United States, so then they used 7290 for Carriers.

Additionally, Stevens indicated that Carriers handled some claims made against United in the United States. Robinson also introduced in evidence a letter dated April 29, 1987, from the claims manager of United's Canadian liquidator stating that "United Canada was responsible for accidents involving Maislin which occurred in Canada, whereas Carriers Insurance was responsible for accidents which occurred in the United States."

Recognizing that United had issued Maislin's policy No. 8290, Robinson argued that Carrier "took the policy form of their subsidiary, United Canada, on which appeared the number '8290' and adopted it as Carriers Policy Number '7290'." In oral argument, Robinson contended that Maislin had "at least two insurers in United Canada and Carriers." According to him, "United Canada issued the policy, and then it was issued by adoption by Carriers Insurance Company."

In support of his contention, Robinson likens Carriers' ICC filings to an informal insurance agreement or binder made by an authorized agent of the insurer to an insured. However, in those instances, there must be some evidence of the alleged insured's agreement to such an arrangement. *Dickerson v. Conklin*, 218 Va. 59, 67-68, 235 S.E.2d 450, 456 (1977). The record is silent on that subject.

Moreover, there is no evidence that Carriers ever notified Maislin that it was assuming or "adopting" any liability under United's policy, or that it furnished Maislin with a copy of its ICC

certificate or of the two endorsements containing Carriers' name. Therefore, it cannot be said that Carriers "issued" an informal insurance agreement or binder to Maislin.

■ Finally, Carriers' apparently false certification to the ICC might have subjected it to liability by estoppel to parties with personal injury and property claims against Maislin arising in the United States. However, that liability would be based on the misrepresentations made in the certificates or filings, not on any insurance policy issued by Carriers.

■ Although we must construe the evidence in the light most favorable to Robinson, who prevailed in the trial court, we conclude that at most it shows only an intercorporate agreement between Carriers, the parent corporation, and United, its subsidiary, to adjust each other's claims arising in the jurisdictions where each was authorized to do business. It does not support the conclusion that Carriers "issued" United's policy within the context of former Code § 38.1-760(4), as the trial court concluded. Accordingly, we will reverse the judgment of the trial court and enter final judgment for the Association.

*Reversed and final judgment.*