**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-2038**

MCKAY CONSULTING INCORPORATED, a Louisiana corporation,

Plaintiff - Appellant,

v.

ROCKINGHAM MEMORIAL HOSPITAL, a Virginia corporation,

Defendant – Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. Glen E. Conrad, Chief District Judge. (5:09-cv-00054-gec-bwc)

Argued: September 20, 2011      Decided: October 28, 2011

Before TRAXLER, Chief Judge, and AGEE and DIAZ, Circuit Judges.

Affirmed by unpublished opinion. Judge Agee wrote the opinion, in which Chief Judge Traxler and Judge Diaz joined.

**ARGUED:** Matthew T. Nelson, WARNER, NORCROSS & JUDD, LLP, Grand Rapids, Michigan, for Appellant. Daniel Leroy Fitch, WHARTON ALDHIZER & WEAVER, PLC, Harrisonburg, Virginia, for Appellee. **ON BRIEF:** John J. Bursch, WARNER, NORCROSS & JUDD, LLP, Grand Rapids, Michigan, for Appellant. Thomas E. Ullrich, Lauren R. Darden, WHARTON ALDHIZER & WEAVER, PLC, Harrisonburg, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

AGEE, Circuit Judge:

McKay Consulting, Inc. ("McKay") appeals the district court's award of summary judgment to Rockingham Memorial Hospital ("RMH"). In this action based on diversity jurisdiction, McKay sought a declaratory judgment that either an oral contract or an implied-in-fact contract had been formed with RMH. The district court held no contract was formed under Virginia law because no meeting of the minds occurred between the parties and essential terms of the purported contract were so ill-defined as to render them unenforceable. For the reasons set forth below, we affirm the judgment of the district court.

## I.

McKay is a self-described "national healthcare reimbursement consultant" that analyzes federal healthcare laws and provides client hospitals with information on opportunities to increase their government reimbursement payments, primarily from Medicare. McKay researches hospitals that could potentially benefit from changes in government regulations, then approaches the hospitals and attempts to have them engage its services to implement the concept. To achieve this goal, McKay offers to provide its services for a contingency fee, in

2

exchange for an agreement by the target hospital that it will keep McKay's ideas confidential and retain McKay as its agent.[1]

In this case, McKay contends it discovered a concept to significantly increase Medicare or related reimbursements for certain hospitals, including RMH.[2] As part of McKay's marketing efforts, its agent, Bob Brown, contacted Susan Holsinger, RMH's Director of Accounting and Finance. Brown told Holsinger that McKay had discovered a "reimbursement issue" that Brown wished to discuss with Holsinger, but Brown declined to discuss the specifics of the idea. In a subsequent e-mail, Brown wrote that "[t]he issue is in excess of $500,000 per year and affects more than one year." J.A. 347. In fact, McKay internally estimated that RMH stood to gain closer to eight million dollars annually, but feared that disclosure of the true amount of benefit would lead RMH to discover the concept on its own.

---

[1] As noted below, because McKay was the nonmoving party against whom summary judgment was granted, we recite the facts and reasonable inferences drawn therefrom in the light most favorable to it. Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011).

[2] The concept proffered by McKay to RMH was not widely recognized in 2009. In short, it involved RMH applying to change its Medicare status from that of an "urban" hospital to a "rural" hospital which would then allow RMH to apply for sole community hospital ("SCH") status. Such a change, if approved by federal agency authorities, could significantly increase the Medicare reimbursement rate for RMH. This concept now appears to be common knowledge throughout the health care industry.

In a May 26, 2009 e-mail to Holsinger, Brown explained

> From our discussion I don't believe that you are aware of, or working on, the issue. But if you are you'll have <u>no obligation</u> to us whatsoever. . . . If you aren't aware of the issue we'll ask that you do keep its nature confidential, and that if you choose to address it, you'll use McKay Consulting as your agent. Our fee would be 20% of the adjustment for up to four (4) years adjustment after it has materialized.

J.A. 525 (emphasis in original). Michael McKay (McKay's principal) and Brown met with Holsinger on June 3, 2009 to formally "pitch" the idea. Michael McKay later testified that prior to disclosing the idea to Holsinger, he and Brown reviewed all of the terms of a proposed agreement with RMH, including confidentiality, a twenty percent annual contingency fee, and the requirement that RMH use McKay as its agent should it decide to implement the concept. Michael McKay also testified that before he disclosed the idea, he and Brown repeatedly asked Holsinger whether she was "comfortable" going forward and verified that she wanted them to proceed and tell her about the concept. McKay did not offer a written agreement to Holsinger, but contends a binding contract with RMH was formed at the June 3, 2009 meeting based on her oral commitment and McKay's description of the concept.[3]

---

[3] RMH argues on appeal that Holsinger lacked either actual or apparent authority to bind it to a contract. The district court did not address this issue in view of its decision that no contract was formed on other grounds. In light of our conclusion that there was no mutual assent to the essential
(Continued)

4

Although the parties disagree about whether Holsinger explicitly agreed to the terms proposed by McKay, it is undisputed that Michael McKay and Brown presented Holsinger with a description of the concept and a binder containing documents that described it in detail. In the course of this presentation, McKay disclosed for the first time that upon conversion from an urban to a rural hospital classification RMH would likely incur several million dollars in reimbursement losses until it obtained SCH status, which was not guaranteed.

After Holsinger expressed enthusiasm for the idea, Brown and Michael McKay then met with Michael King, RMH's Chief Financial Officer, to whom they explained the reimbursement concept. King had a number of questions and expressed concern over whether RMH would be indemnified for the up-front losses. King also stated that the twenty percent fee was too high.

In the days that followed the meeting, Michael McKay continued to discuss the arrangement with both Holsinger and King and sent a written agreement that, according to McKay, simply memorialized the parties' oral agreement. Although McKay now contends a firm, oral contract was made at the June 3, 2009 meeting with Holsinger, an e-mail between McKay and Brown that

terms of a contract under Virginia law, we do not address this issue.

5

day after the meeting appears equivocal.[4]  In addition to a merger clause, the proposed written contract contained the compensation term of "twenty percent (20%) of the additional reimbursement received by RMH as a result of this Service for the first three (3) years for which the Service has a positive effect."[5]  J.A. 546 (emphasis added).  RMH never responded to the proposed written contract.  King, meanwhile, continued to insist that the twenty percent contingency fee was too high, and proposed either a flat fee or an hourly payment schedule in lieu of the twenty percent contingency.  McKay rejected the counter-proposal, but offered to reduce the amount of the contingency fee to nineteen percent.

As the relationship deteriorated, McKay asserted that the parties had reached an agreement and that King was "trying to retrospectively negotiate an already agreed upon fee[,]" and

---

[4] "The meeting with [RMH] lasted until 4 pm.  The accounting and reimbursement staff seem to be in agreement 100% to move forward.  The CFO, who knows [Michael McKay] peripherally, had concerns about: a. The fee; b. The certainty of success."  J.A. 1449.

[5] Brown later testified that the reference to a three-year period was a typographical error, and that he had intended to memorialize the four-year term mentioned in his e-mail with Holsinger.  However, a June 17, 2009 e-mail between Michael McKay and Brown concluded the discrepancy between a 4-year or 3-year duration is "never going to be explained away."  J.A. 1457.

stated that "[w]e are not attempting to change our agreement and we ask that you do the same." J.A. 548.

Invoking diversity jurisdiction, McKay filed a complaint against RMH seeking, among other things, a declaratory judgment that the parties had an enforceable oral contract, or, in the alternative, an enforceable implied-in-fact contract.[6] McKay alleged RMH had entered into an agreement (either orally or implied-in-fact) by which RMH agreed (1) to keep McKay's idea confidential; (2) if it chose to pursue the idea, it would retain McKay as its agent to perform the work necessary to implement the concept; and (3) to pay McKay twenty percent of "additional revenues" that RMH received as a result of implementing the idea. RMH moved for summary judgment and McKay made a cross-motion for partial summary judgment.

While concluding that the parties had an enforceable agreement to keep McKay's concept confidential, the district court held that "no reasonable jury could find that McKay and RMH mutually assented to all of the essential terms outlined in the original complaint." J.A. 2425. In granting summary judgment to RMH, the district court held that "the record

---

[6] McKay also sought a declaratory judgment on promissory estoppel grounds, and made claims for unjust enrichment and misappropriation of trade secrets. Those claims were dismissed pursuant to Fed. R. Civ. P. 12(b)(6), and McKay does not appeal from that judgment.

7

evinces no meeting of the minds as to the compensation and agency terms asserted by McKay. Moreover, the court conclude[d], as a matter of law, that the compensation and agency terms are not established with reasonable certainty." Id.

McKay filed a timely appeal from the district court's judgment and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Whether a party is entitled to summary judgment is a question of law that we review de novo. Canal Ins. Co. v. Distrib. Servs., Inc., 320 F.3d 488, 491 (4th Cir. 2003). Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party (McKay, in this case), "no material facts are disputed and the moving party is entitled to judgment as a matter of law." Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003).

As noted by the district court and the parties, "because the matter is before us in diversity, we are bound by the applicable state substantive law." Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1234 (4th Cir. 1996).

8

III.

The district court based its grant of summary judgment upon its primary holding that McKay and RMH failed to mutually assent to the essential terms of the purported contract, those being "compensation and agency." The district court held in the alternative that there was no contract under Virginia law because those terms were "not established with reasonable certainty." J.A. 2425. McKay contends that the district court erred as to each holding.

Although the district court stated its decision as alternative holdings, those principles are two sides of the same coin. There can be no meeting of the minds so as to form a valid contract when the essential terms are not "established with reasonable certainty." Accordingly, a single analysis which blends the district court's holdings resolves the question whether a valid contract under Virginia law was formed in this case.

A.

The Supreme Court of Virginia has consistently set forth as necessary elements of contract formation that:

> [T]he parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent, and, therefore, no contract. Both parties must assent to the same thing in the same sense, and their minds must

9

> meet as to all the terms. If any portion of the proposed terms is not settled . . . there is no agreement.

Smith v. Farrell, 98 S.E.2d 3, 7 (Va. 1957) (citations omitted); see also Persinger & Co. v. Larrowe, 477 S.E.2d 506, 509 (Va. 1996) ("Until the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent, and therefore, no contract.") (citation omitted). "[M]utuality of assent—the meeting of the minds of the parties— is an essential element of all contracts." Moorman v. Blackstock, Inc., 661 S.E.2d 404, 409 (Va. 2008) (internal quotation marks and citation omitted).

When determining whether mutual assent exists to a degree sufficient to form an enforceable agreement, Virginia courts ascertain whether a party assented to the terms of a contract from that party's words or acts, not from his or her unexpressed state of mind. Wells v. Weston, 326 S.E.2d 672, 676 (Va. 1985). Virginia courts "cannot make a new contract for the parties, but must construe [the contract's] language as written." Berry v. Klinger, 300 S.E.2d 792, 796 (Va. 1983).

### 1. Compensation

The most vivid proof supporting the district court's holding that there was no meeting of the minds as to the compensation element is McKay's inability, even through oral

10

argument, to consistently identify the term of compensation to which the parties were alleged to have agreed. During the course of this litigation, McKay asserted at least four different iterations of what constituted the compensation term to which the parties were alleged to have agreed.[7]

Based on the May 26th e-mail, which McKay contends formed the basis for a June 3, 2009 contract, McKay argues the compensation term was "20% of the adjustment." The proposed written contract of June 4, 2009, however, has a different compensation term of "20% of the additional reimbursement." J.A. 546. This version is followed by another in a June 19, 2009 e-mail from Michael McKay to King in which he represents the compensation term is "increased reimbursements." J.A. 1160.

These different iterations of a compensation term are confusing enough, but what compellingly sinks McKay's claim is its inability, even in its own complaint, to tell the court the term of compensation. In both Count I (oral contract) and Count II (implied in fact contract), McKay (omitting any claim of

---

[7] Arguably McKay proposed a fifth and separate explanation of the agreed compensation term in its opening brief by stating compensation was "20% of the benefit to RMH for four years." Br. of plaintiff-appellant 3 (emphasis added). As that variation was not placed before the district court, our analysis will be limited to the four iterations that were. We include the "benefits" version only to underscore McKay's utter failure to specify an essential term of the purported contract.

"adjustment" or "increased reimbursement") pleads that the compensation would be "20% of any additional reimbursements" but then prays for relief in the amount of "20% of any additional revenues." J.A. 27. If a plaintiff can't plead the essential terms of its own proffered contract, no court will make a contract for it. See City of Manassas v. Bd. of Cnty. Sup'rs of Prince William Cnty., 458 S.E.2d 568, 572 (Va. 1995) (while courts will not permit parties to be released from obligations that they have assumed, Virginia courts nevertheless "cannot make contracts for the parties") (citation omitted).

Setting aside the discrepancy as to whether any term of compensation would last for three or four years, even if McKay had settled on one of its multiple proposed definitions of compensation as the actual contract term of the parties, it would beg too many questions to be established as a contract term with reasonable certainty.

For example, if we assume McKay chose the prayer for relief iteration of "20% of any additional revenues" as winning the term-of-compensation lottery, what precisely are the "additional revenues"? Are they 20% of gross RMH revenue, Medicare revenue, Medicaid revenue, Tricare revenue or some combination of the above with perhaps other categories added in? Is the compensation to be "additional revenue" net of any particular expenses and if so, what are they? A similar analysis undercuts

12

each of the other potential terms of compensation-"adjustment," "additional reimbursement," or "increased reimbursements" and underscores the void in McKay's argument that the parties agreed to an ascertainable contract term of compensation.

Without question, compensation is an essential contract term. See Chittum v. Potter, 219 S.E.2d 859, 863-64 (Va. 1975) (no contract formed when parties failed to demonstrate mutual assent to the price term of a certain parcel of property). As a matter of law, there can be no meeting of the minds between the parties as to an essential term when that term is unknown. "In order to be binding, an agreement must be definite and certain as to its terms and requirements; it must identify the subject matter and spell out the essential commitments and agreements with respect thereto." Dodge v. Trustees of Randolph-Macon Woman's Coll., 661 S.E.2d 801, 803 (Va. 2008) (quoting Progressive Const. Co. v. Thumm, 161 S.E.2d 687, 691 (Va. 1968)). As demonstrated by McKay's complaint, McKay could not settle upon a readily ascertainable definition of what it was to be paid, much less what RMH purported to have covenanted to pay it.

## 2. Agency

The district court also correctly held that no contract was formed between the parties because the essential term of agency could not be ascertained with reasonable certainty. "[A]n agreement for service must be certain and definite as to the nature and extent of service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid, or it will not be enforced." Mullins v. Mingo Lime & Lumber Co., 10 S.E.2d 492, 494 (Va. 1940) (citation omitted).

McKay pled in its complaint that RMH agreed that if it chose to implement McKay's concept, it would "[r]etain McKay as its agent to perform the work necessary to implement McKay's idea." J.A. 27. In the May 26 e-mail from Brown to Holsinger, Brown stated that "if you choose to address [the issue], you'll use McKay Consulting as your agent." J.A. 1395. Even through oral argument, McKay could not identify the scope of agency under the purported contract.

Taken in the light most favorable to McKay, the agency terms were so vague that the parties could not have mutually assented to a contract. On their face, the terms "use" and "perform the work necessary to implement McKay's idea" simply do not convey any meaning that would allow the parties to

14

articulate what McKay is bound to do under the terms of the alleged agreement.

McKay argues, however, that RMH's experience with other consultants in the past should inform this court's analysis of whether the parties assented to the agency term. Br. for plaintiff-appellant 30-31. McKay's reliance on RMH's experience, however, is misplaced. Although RMH had engaged the services of consultants to address Medicare issues, those consulting agreements explained in detail the respective duties of the parties. Comparing the alleged agreement here to others found in the record, it is clear that the terms here are elusive. As the district court noted, one of McKay's prior agreements involved a twenty-two page contract and a two page, single-spaced addendum that detailed the services McKay was to provide. Thus, to the extent that the evidence in the record shows a standard practice in the Medicare reimbursement consulting industry, the alleged agreement here falls well short of establishing the existence of a contract.

McKay, in its brief and at oral argument, asserted that its agency relationship with RMH would merely require McKay to perform certain administrative tasks. Even if this court were to accept McKay's claim at oral argument that the agency term here entails McKay "fill[ing] out the appropriate paperwork in conjunction with the hospital to go forward with the idea," it

15

remains unknown as to what that "paperwork" comprises, who is responsible for any expenses, and other ancillary duties such as providing attorneys and experts in the event of litigation. Oral Argument at 41:24. And litigation seems possible, as McKay acknowledged that the Center for Medicare and Medicaid Services could initially block RMH's application to change status, therefore requiring litigation.

For these reasons we agree with the district court that the essential term of agency is simply too ill-defined to have formed a contract enforceable in Virginia.

B.

In the absence of clear contract terms, McKay argues that its purported contract is nonetheless enforceable because the trier of fact could deduce and supply the terms of agreement. McKay cites High Knob, Inc. v. Allen, 138 S.E.2d 49, 53 (Va. 1964) for the proposition that Virginia contract "law does not favor declaring contracts void for indefiniteness and uncertainty, and leans against a construction which has that tendency." McKay points out that this principle is "especially true where there has been partial performance." Id. However, Virginia courts lack authority to "supply virtually every essential element" of a contract. Dickerson v. Conklin, 235 S.E.2d 450, 456 (Va. 1977).

While McKay is correct that the Supreme Court of Virginia approved a presumption in favor of enforcing a contract in High Knob on the unique facts of that case, the court was clear to reiterate two vital contract principles: (1) "courts cannot make contracts for the parties," and (2) courts will not "permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in the light of all the surrounding circumstances." 138 S.E.2d at 53. The case at bar, however, is not remotely analogous to the situation present in High Knob.

High Knob was a developer that sold certain lots in a subdivision to two buyers. Id. at 49-51. In the written sales documents, no reference was made to supplying water to the residences to be built on the lots; however, High Knob's restrictive covenants barred the lot owners from developing or maintaining a "well, spring, or water system of any type." Id. at 51. The trial court found that McElroy, High Knob's secretary, promised the buyers that High Knob had a water system and would furnish "a reasonable quantity of water" to houses constructed in the subdivision for a $200 hook-on fee; that this was the only consideration to be paid for the water service; and that this arrangement was one of the inducements to purchase the lots. Id. Later, High Knob refused to accept the buyers' $200 hook-on payments and insisted that in order for them to receive

17

water, they would have to sign an agreement that was contrary to McElroy's covenants.

The Virginia Supreme Court concluded that McElroy's agreement with the two buyers was enforceable, notwithstanding the fact that the oral agreement did not specify a quantity of water to be supplied to a residence. The court determined from "the circumstances under which the agreements were made" this term was simply "that which was reasonably necessary for residential purposes . . . [for] so long as its water system was capable of supplying it . . . [for] their proportionate share of the maintenance costs." Id. at 53-54. The court also found it significant that High Knob had, in fact, supplied the buyers with water for six months before cutting it off when Allen refused to sign the written water contract tendered by High Knob.

The case at bar is a far cry from High Knob. As the preceding discussion well illustrates, the "circumstances" in this case give no reasonably ascertainable basis upon which to conclude the parties made an agreement as to the essential missing terms.

McKay's solution, in the absence of either compensation or agency terms necessary to form a valid contact, is essentially a "Price is Right" approach; give the trier of fact multiple options and let it pick one, any one. No principle of contract

18

law supports this methodology, including <u>High Knob</u>.  Virginia law simply does not permit finding a contract when the trier of fact must determine one from among multiple choices presented by a party for a term of compensation, then define what the chosen term encompasses, and finally delineate the scope of agency <u>sua sponte</u>.

Accordingly, we conclude that <u>High Knob</u> is simply not applicable to the case at bar.  Rather, <u>High Knob</u> supports our conclusion to the extent that it instructs courts not to make contracts for the parties, and requires essential contract terms to be reasonably certain to be enforced.


IV.

On this record, "no reasonable jury could find that the parties mutually assented to the compensation and agency terms set forth in the complaint."  For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

19