98 F.3d 1457
 65 USLW 2300, 20 Employee Benefits Cas. 2136,
Pens. Plan Guide (CCH) P 23928K
 COYNE & DELANY COMPANY, Plaintiff-Appellant,
v.
Joe B. SELMAN, d/b/a Benefits Management; Donald F. Smith &
Associates, d/b/a Benefits Consultant Services,
Defendants-Appellees.
COYNE & DELANY COMPANY, as the successor Plan Administrator
of the Coyne & Delany Company Employee Benefit
Plan, Plaintiff-Appellant,
and
Peter G. Delany, as a participant under the Coyne & Delany
Company Benefit Plan, Plaintiff,
v.
Joe B. SELMAN, d/b/a Benefits Management, d/b/a Benefits
Management Group; Donald F. Smith & Associates, Trading in
Virginia as Donald F. Smith & Associates, Incorporated,
d/b/a Benefits Consultant Services, Defendants-Appellees.
COYNE & DELANY COMPANY, as the successor Plan Administrator
of the Coyne & Delany Company Employee Benefit Plan; Peter
G. Delany, as a participant under the Coyne & Delany Company
Benefit Plan, Plaintiff-Appellants,
v.
Joe B. SELMAN, d/b/a Benefits Management, d/b/a Benefits
Management Group; Donald F. Smith & Associates, d/b/a
Benefits Consultant Services, Trading in Virginia as Donald
F. Smith & Associates, Incorporated, Defendants-Appellees.
 Nos. 94-1676, 95-1380 and 95-2241.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 10, 1995 in No. 94-1676.
Argued Dec. 8, 1995 in Nos. 95
-1380 and 95-2241.
Decided Oct. 25, 1996.
 
 ARGUED: Peter Booth Vaden, James Nichol Deinlein, Deinlein & Vaden, Charlottesville, VA, for Appellants. Joseph Francis Cunningham, Cunningham & Associates, Alexandria, VA, for Appellee Selman; Calvin Wooding Fowler, Jr., Williams, Mullen, Christian & Dobbins, Richmond, VA, for Appellee Smith & Associates. ON BRIEF: John W. Montgomery, Cunningham & Associates, Alexandria, VA, for Appellee Selman; William D. Bayliss, Williams, Mullen, Christian & Dobbins, Richmond, VA, for Appellee Smith & Associates.
 Before MURNAGHAN, WILLIAMS, and MICHAEL, Circuit Judges.
 No. 94-1676 affirmed in part, reversed in part, and remanded with instructions; Nos. 95-1380 and 95-2241 reversed and remanded with instructions by published opinion. Judge MICHAEL wrote the opinion, in which Judge MURNAGHAN and Judge WILLIAMS joined. Judge WILLIAMS wrote a separate concurring opinion.
 OPINION
 MICHAEL, Circuit Judge:
 
 
 1
 In this opinion we decide two related cases. In the first case (Selman I ) plaintiff Coyne & Delany Company (Delany) appeals from a grant of summary judgment in favor of defendants Joe B. Selman, who does business as Benefits Management Group, and Donald F. Smith & Associates, Inc., which does business as Benefits Consultant Services (BCS).[1] The magistrate judge[2] held that Delany lacked standing to assert claims pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. (ERISA). The magistrate judge ruled, in the alternative, that Delany's ERISA-based claims failed because the defendants' actions caused no harm. In addition, the magistrate judge held that ERISA preempted Delany's state law claim against the defendants for professional malpractice in effecting insurance. We first hold that Delany, in its capacity as a fiduciary, has standing under ERISA to sue the defendants for ERISA violations. Second, we conclude that the magistrate judge erred in holding that the defendants' actions (as ERISA fiduciaries) did not harm the Plan. Finally, we hold that ERISA does not preempt Delany's garden-variety malpractice claim asserted against the defendants in their (non-fiduciary) capacities as insurance professionals.[3]
 
 
 2
 In the second case (Selman II ) Delany appeals from the magistrate judge's conclusion that Delany's second suit, in which Delany made allegations substantially the same as those in the first suit, was barred by res judicata. Because further proceedings will be necessary in Selman I, there is no final judgment that could bar Selman II. Both cases are remanded for further proceedings, and in the interest of judicial economy our remand is with instructions to consolidate Selman I and Selman II.
 
 I.
 A.
 
 3
 We turn first to the facts, which we construe in the light most favorable to Delany, the non-moving party below. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 
 4
 Plaintiff Delany, a New York corporation, is a manufacturing company with 75 employees. Most of the employees make toilet flush valves at Delany's factory and principal place of business located in Albemarle County, Virginia. The small company has been in business for many years. It follows an unbending policy of never laying off a sick employee, and it has always provided its employees and retirees with health insurance coverage. Prior to April 1, 1991, Delany had a group health insurance policy for its employees with Blue Cross/Blue Shield of Virginia (Blue Cross).
 
 
 5
 Defendant Selman operates a sole proprietorship called Benefits Management Group. Selman specializes in designing and administering group health insurance plans. He holds himself out to the public as a professional with expert knowledge on group health insurance matters.
 
 
 6
 Defendant BCS is an incorporated insurance consulting and design group. It also functions as a third-party administrator or as a contract supervisor for ERISA plans. Like Selman, BCS holds itself out to the public as a professional organization with expert knowledge on group health insurance matters.
 
 
 7
 In late 1990 Selman and BCS offered to create for Delany a selfinsured employee health benefit plan. Delany, however, was not interested in cancelling its existing Blue Cross policy without a commitment from the defendants that they could design a nearly identical replacement plan at less cost to Delany. The defendants represented that the plan they could create would cost Delany less than its present insurance with Blue Cross and still provide all of Delany's employees with coverage. To that end, on February 26, 1991, Selman and BCS submitted a formal proposal (the Proposal) to Delany.
 
 
 8
 The Proposal's introduction explained that the defendants' selffunded health care plans could "reduce corporate expense without compromising the level of employee benefits." It then assured Delany that self-funding "does not place the employer in a position of assuming unlimited liability." Because, "[t]hrough the judicious use of 'Stop-Loss Excess ' insurance, a cap is placed on the total amount of claims to be self-insured during a policy year and for a single catastrophic event." The section entitled "HOW THE SELF-FUNDED PLAN OPERATES" provided greater detail. With respect to the issue of "PLAN DESIGN," the Proposal explained that the defendants could closely replicate Delany's existing program of health care benefits. The Proposal also asserted that the Plan could "easily be adapted" to Delany's specific needs. With respect to "FUNDING," the Proposal "GUARANTEED " Delany that the premiums it paid to a special account would represent its "MAXIMUM LIABILITY." With respect to "STOP-LOSS EXCESS INSURANCE," the Proposal claimed that excess liability insurance allowed "even small employers to safely adopt self-funded plans." Finally, the section on "MEDICAL COVERAGE" explained that "Pre-Existing Conditions will be applied on a No Loss/No Gain basis for those enrolled on the original effective date of the self-funded plan."
 
 
 9
 On April 5, 1991, in response to the Proposal and the defendants' assurances that Delany could save $6,000 per month on its insurance costs, Delany accepted the defendants' offer to design a self-funded insurance plan with a reinsurance stop-loss feature. Under the contemplated Plan, coverage for Delany's employees was to continue on a "No Loss/No Gain" basis. In insurance parlance "No Loss/No Gain" typically means that a replacement group insurance policy will not impose waiting periods or exclude individuals from coverage who were covered under the policy being replaced. The No Loss/No Gain conversion was theoretically possible because of the reinsurance feature. The reinsurance was designed to guarantee that Delany's financial exposure did not exceed the predictable amount of $10,000 on any one medical claim.
 
 
 10
 Delany also hired the defendants to work for the Plan. Specifically, in the Plan itself Delany designated Selman as Plan Administrator and BCS as Plan Supervisor. Delany, however, retained the power to amend the Plan at any time.
 
 
 11
 Under the new Plan Delany paid monthly premiums of approximately $22,000. The premiums consisted of (1) payment to Selman for serving as Plan Administrator, (2) payment to BCS for serving as Plan Supervisor, (3) payment to the reinsurer for covering employee medical claims above $10,000, and (4) payment to a fund for employee medical claims below the $10,000 reinsurance threshold.
 
 
 12
 At the time of conversion to the new Plan in April 1991, Herman Tyree (Tyree or the elder Tyree), a 15-year veteran at Delany's factory, was on sick leave from work. Tyree had major heart surgery in early February 1991 and was recuperating at home. His coverage under the Blue Cross policy continued when he went on sick leave.
 
 
 13
 As early as April 8, 1991, Delany had fully apprised Selman and Selman's agent, Alan Archer, about Tyree's medical condition. This information was passed to Selman and Archer by Peter Delany, Vice President in Charge of Personnel and Insurance, and Tyree's son, Roger Tyree, a maintenance man at the factory. Alan Archer's handwritten notes from a meeting with Roger Tyree and Peter Delany on April 8, 1991, said the following: "Tyree heart cond. out indefinitely--no phone # available [address omitted] son is Roger Tyree at Coyne & Delany." Archer faxed this information to Selman.
 
 
 14
 In response to the information from Archer, Selman drafted a letter to be sent to the elder Tyree. The letter, dated April 15, 1991, and signed by Delany's President, A. Graham Delany, informed Tyree that the Company would be changing its group health insurer, retroactive to April 1, 1991. It went on to explain that Tyree could enroll in the new plan by completing the enclosed forms. The letter assured Tyree that his cost of coverage would "remain the same as it had been under the previous plan." It noted an unidentified "minor change" in the benefit coverage. And it closed by telling Tyree that "[o]ur plan administrator [Selman] will send you a new identification card and plan booklet in the next few weeks if you have not returned to work."
 
 
 15
 The very next day, April 16, 1991, Tyree stopped by the Delany factory and submitted his new enrollment forms. From that point on Delany paid premiums for Tyree's coverage under the new Plan, and Peter Delany gave Roger Tyree an insurance card for the elder Tyree. On April 20, 1991, the elder Tyree was admitted to the hospital. On the night of the admission Roger Tyree called Selman at home for pre-approval. Selman, who was fully aware that the elder Tyree had a serious heart condition and had been off from work for months, authorized Tyree's admission. In fact, Selman told Roger Tyree not to "worry about it."
 
 
 16
 Meanwhile, Selman had already drafted another letter for A. Graham Delany's signature. This letter, dated April 8, 1991, canceled Delany's policy with Blue Cross effective March 31, 1991.
 
 
 17
 After cancellation of the Blue Cross policy Tyree, who was still in the University of Virginia Medical Center (UVA), had a 30-day window to convert his group Blue Cross insurance into a personal insurance policy. If he had done so, Delany would have continued to pay the premiums. In any event, Tyree did not convert his Blue Cross insurance, and Blue Cross later took the position that he had no coverage.
 
 
 18
 After the Blue Cross policy was cancelled, Selman and BCS drafted the 63-page Plan document. They provided it to Delany around July 1, 1991, three months after Blue Cross coverage was cancelled. The new Plan contained an "active service" provision. The provision excluded the elder Tyree from coverage because he failed to perform "all the regular duties of his employment on a full-time basis" on March 31, 1991.
 
 
 19
 In addition, BCS, at Selman's request, applied for and received stop-loss insurance for the Plan from Standard Security Life Insurance Co. of New York (Security). The Security stop-loss policy contained two features that were each independently sufficient to shield Security from paying for excess losses caused by Tyree's illness. First, the Security policy provided that it only covered excess loss incurred on behalf of persons covered under the Plan. Since the active service provision rendered Tyree ineligible to participate in the Plan, Security's policy necessarily excluded excess coverage for Tyree.[4] Second, the Security policy contained an active service requirement similar to the active service provision in the Plan. This active service provision also shielded Security against liability for any costs associated with Tyree. Delany, however, had no knowledge of these provisions. Neither Selman nor BCS ever provided Delany with a copy of the Security policy.
 
 
 20
 In fact, before July 1, 1991, Delany had no reason to know about any active service provisions. The formal Proposal accepted by Delany made no mention of an active service provision in either the Plan or the stop-loss policy. The defendants never advised Delany that any active service provisions might appear in the Plan or that an active service provision might preclude coverage for the elder Tyree. Indeed, on the night of April 20, 1991, when Roger Tyree called Selman for pre-approval of his father's hospitalization, Selman said nothing about an active service provision. Instead, as we have said, Selman advised the younger Tyree not to worry about his father's coverage.
 
 B.
 
 21
 By July 1991 Tyree had been in the UVA hospital for over two months. He was confined to the intensive care unit, and his bills were mounting rapidly. UVA wanted payment, so it contacted Selman. As a result, on July 10, 1991, BCS formally notified Security of the Tyree claim. However, the notification form BCS completed on behalf of the Plan failed to answer the following critical question: "Was employee actively at work on effective date of policy? ( ) YES ( ) NO."
 
 
 22
 After BCS notified Security, Selman advised Delany that the Plan owed UVA $160,000. In a follow-up letter to A. Graham Delany, Selman outlined "the procedure we must follow for payment and reimbursement of these claims." Selman wrote that "the reinsurance carrier requires that the plan pay the claims prior to being reimbursed for any amount in excess of the specific deductible." Therefore, Selman advised Delany to "set up a separate line of credit with your bank whereby the plan is advanced the amount of money we need to pay the claim." Selman closed by reassuring Delany that "there is not liability to Coyne & Delany other than the original specific deductible amount [$10,000] which is payable from the claim fund."
 
 
 23
 This advice was flawed. First, Tyree was neither eligible to participate in the Plan nor eligible for excess loss coverage under the Security policy. Second, the Security policy permitted Delany to ask Security to advance money due under the policy. Nevertheless, still under the mistaken assumption that Tyree was a covered Plan participant, Delany followed Selman's flawed advice and approached its bank for a loan.
 
 
 24
 The bank asked Delany to request a letter from the reinsurer (Security) acknowledging that the reinsurer would reimburse the money. In response, Delany asked Selman to make this inquiry. Around September 26, 1991, a BCS employee, a Mr. Hermann, contacted Security's third party administrator, American Progressive Benefits, Inc. (APB).
 
 
 25
 On September 29, 1991, while APB was considering the reimbursement inquiry from BCS, Tyree died. His final hospital bill totaled more than $600,000.
 
 
 26
 On October 4, 1991, APB's Senior Vice President, Dr. Stanley Nuehring, wrote Hermann at BCS. Nuehring's letter read:
 
 
 27
 This is to advise that APB, on behalf of the Standard Security Life policy carried by Coyne & Delany, will reimburse all eligible charges considered in accordance with the provisions of the Plan Document and Excess Stop Loss contract.
 
 
 28
 This vague response apparently satisfied the bank because it opened an unsecured line of credit for Delany. Delany borrowed $160,000, reloaned the money to the Plan, and then the Plan Administrator (Selman) paid the money to UVA.
 
 
 29
 Following Tyree's death and the initial payment to UVA, the Plan applied to Security for reimbursement in the amount of $150,000. The Plan also asked Security to pay the remainder of Tyree's obligation to UVA (about $440,000). Security refused to make any payment because Tyree was not "actively at work" at any time after the reinsurance became effective.
 
 
 30
 Eventually, Delany fired Selman and BCS, and, on April 1, 1994, took upon itself the duty of administering all aspects of its Plan.
 
 C.
 
 31
 In 1993 Delany filed its first lawsuit (Selman I) against Selman and BCS. First, in its (alleged) capacity as a fiduciary, Delany brought ERISA-based claims against Selman and BCS in their capacities as fiduciaries. Delany alleged a number of instances where the defendants breached fiduciary duties of care owed to the Plan. Second, in its individual capacity, Delany asserted a state law claim for professional malpractice against Selman and BCS in their capacities as designers of group health insurance plans. In short, Delany charged that the defendants did not provide the product Delany ordered.
 
 
 32
 On April 13, 1994, the magistrate judge granted the defendants' motion for summary judgment. The judge held that Delany was not a fiduciary and therefore lacked standing to sue under ERISA, that the Plan suffered no harm, and that ERISA preempted Delany's state law malpractice claim.[5] The judge also denied Delany's motion to amend its complaint to seek a declaratory judgment concerning the additional $440,000 in medical expenses billed to the Plan by UVA. Delany appeals these rulings.
 
 
 33
 On June 30, 1994, while Selman I was pending on appeal, Delany filed its second lawsuit (Selman II ) against Selman and BCS. In Selman II Delany sues in its capacity as successor Plan Administrator. Peter Delany is added as a party plaintiff in his capacity as a representative plan participant. Apart from not asserting a malpractice claim, the Selman II complaint otherwise makes substantially the same allegations as the Selman I complaint. In addition, the Selman II complaint contains a declaratory judgment claim against the defendants for the additional $440,000 billed to the Plan. It also requests an accounting by the defendants and disgorgement of any excessive fees taken by Selman.
 
 
 34
 The magistrate judge dismissed Delany's complaint in Selman II, holding that the prior adjudication in Selman I barred Selman II. Delany also appeals this judgment.
 
 
 35
 We review the decisions in both cases de novo. Fed.R.Civ.P. 56(c); See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Meekins v. United Transp. Union, 946 F.2d 1054, 1057 (4th Cir.1991).
 
 II.
 
 36
 Turning to the issues on appeal in Selman I, we begin with the question whether the magistrate judge erred in ruling that Delany lacked standing in that case to sue under ERISA.[6] According to the pleadings and written submissions in Selman I, which was filed in 1993, Delany was employer and Plan Sponsor, but it had not yet become Plan Administrator and Plan Supervisor.[7] Delany asserted federal jurisdiction in Selman I (as it did in Selman II ) under ERISA, 29 U.S.C. § 1132(e)(1), which gives district courts jurisdiction over actions brought by ERISA fiduciaries. Because Delany did not "function[ ] as an administrator," the magistrate judge held Delany was not a fiduciary and therefore lacked standing to sue. We disagree and hold that in Selman I Delany was a fiduciary with respect to its management power to appoint, retain and remove the Plan Administrator and Plan Supervisor.
 
 
 37
 ERISA provides that a "civil action may be brought--... by a participant, beneficiary or fiduciary." 29 U.S.C. § 1132(a)(2). A plan sponsor, unlike a participant or beneficiary, does not acquire standing as a result of its statutory title of sponsor.[8] A plan sponsor can, however, have standing to the extent it retains or exercises any of the responsibilities listed in the definition of a "fiduciary." Specifically, a person is a "fiduciary" with respect to a plan
 
 
 38
 to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 39
 29 U.S.C. § 1002(21)(A). Of course, fiduciary status is not "an all-or-nothing concept." Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 61 (4th Cir.1992), cert. denied, 506 U.S. 1081, 113 S.Ct. 1051, 122 L.Ed.2d 359 (1993). The inclusion of the phrase "to the extent" in ERISA's definition of fiduciary "means that a party is a fiduciary only as to the activities which bring the person within the definition." Id. See also Licensed Div. Dist. No. 1 MEBA/NMU v. Defries, 943 F.2d 474, 477-78 (4th Cir.1991), cert. denied, 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). Consequently, "[a] fiduciary's standing is not for any and all purposes; rather a fiduciary has standing to bring actions related to the fiduciary responsibilities it possesses." Stephen R. Bruce, Pension Claims, Rights and Obligations 750 (2d ed.1993). See also Defries, 943 F.2d at 478.
 
 
 40
 As the definition implies, a plan sponsor does not become a fiduciary by performing settlor-type functions such as establishing a plan and designing its benefits. See Lockheed Corp. v. Spink, 517 U.S. 882, ----, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153 (1996). See also Jane Kheel Stanley, The Definition of a Fiduciary Under ERISA: Particular Persons and Entities, 27 Real Prop., Prob. & Tr. J. 711, 763 nn. 268-269 (1993) (listing cases where employer-sponsor was held to be acting in its capacity as settlor or employer, not as fiduciary). On the other hand, a plan sponsor does become a fiduciary under the definition if (that is, "to the extent") it retains or exercises "any discretionary authority" over the management or administration of a plan. See Stanley, supra, at 758-62 (discussing activities by employer-sponsors that can confer fiduciary status). Here, Delany appointed Selman as Plan Administrator and BCS as Plan Supervisor. Delany, however, retained the power to amend the Plan at any time, and Delany contends that one aspect of its power to amend (the power to choose and remove fiduciaries) makes Delany itself a fiduciary.[9]
 
 
 41
 We recognize that plan sponsors such as Delany are generally free under ERISA to amend plans without triggering fiduciary status. See Lockheed, 517 U.S. at ----, 116 S.Ct. at 1789. However, the power (through plan amendment) to appoint, retain and remove plan fiduciaries constitutes "discretionary authority" over the management or administration of a plan within the meaning of § 1002(21)(A). Defries, 943 F.2d at 477; Miniat, 805 F.2d at 736; Leigh v. Engle, 727 F.2d 113, 134-35 (7th Cir.1984); Atwood v. Burlington Indus. Equity, Inc., 18 E.B.C.2009, 1994 WL 698314, * 6 (M.D.N.C.); Bromenn Healthcare v. Northwestern Nat'l Life Ins. Co., 806 F.Supp. 799, 804 (C.D.Ill.1992); Newton v. Van Otterloo, 756 F.Supp. 1121, 1132 (N.D.Ind.1991); Mobile, Ala.-Pensacola, Fla. Bldg. and Constr. Trades Council v. Daugherty, 684 F.Supp. 270, 275 (S.D.Ala.1988); 29 C.F.R. § 2509.75-8, D-4 (1995). Moreover, this authority carries with it a duty "to monitor appropriately" those subject to removal. Miniat, 805 F.2d at 736; Leigh, 727 F.2d at 135. See also Atwood, 18 E.B.C.2009, 1994 WL 698314 at * 6; Newton, 756 F.Supp. at 1132. The Department of Labor, an agency responsible for enforcing ERISA, agrees. It has issued an Interpretive Bulletin with the following question and answer on fiduciary responsibility under ERISA:
 
 
 42
 FR-17 Q: What are the ongoing responsibilities of a fiduciary who has appointed trustees or other fiduciaries with respect to these appointments?
 
 
 43
 A: At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.
 
 29 C.F.R. § 2509.75-8 at FR-17.[10]
 
 44
 We are satisfied that Delany was a fiduciary to the limited extent it exercised its discretionary responsibility "to monitor appropriately" and remove the Plan Administrator and Plan Supervisor. This oversight authority would be unnecessarily constricted unless Delany, as fiduciary, has standing to assert claims for any ERISA violations it uncovered in monitoring the Plan Administrator and Plan Supervisor. Delany, therefore, "has standing to sue as a fiduciary 'to the extent' that it challenges, as violative of ERISA ..., any act or practice which pertains to" its responsibility to monitor. Defries, 943 F.2d at 478.
 
 
 45
 The ERISA claims that Delany asserts relate to Delany's own fiduciary responsibility to monitor the performance of its appointees. Accordingly, we hold that Delany has standing in Selman I to assert the ERISA claims alleging that Selman and BCS breached fiduciary duties.
 
 III.
 
 46
 The next issue in the Selman I appeal is whether the magistrate judge erred in ruling that even if the defendants breached fiduciary duties while serving as Plan Administrator and Plan Supervisor, "as matter of law, the plan suffered no loss."[11] Because the Plan paid $160,000 to cover a part of a non-participant's medical bills, we reverse.
 
 
 47
 There was little discussion of this issue in the magistrate judge's opinion. Essentially, the judge simply declared that "It [the Plan] got the money in; it paid the money out. Zero is not damage." Appellees defend this ruling by citing Donovan v. Bierwirth, 754 F.2d 1049 (2d Cir.1985). Bierwirth is not applicable. That case involved pension plan trustees who purchased stock in their parent corporation to help defeat a tender offer. Later, the trustees resold the stock at a profit. The question presented was "the applicable measure of damages." Id. at 1052. To answer the question, the Second Circuit declared that the district court should compare what the pension plan actually earned with what the plan would have earned if its funds had been otherwise invested. Id. at 1056-58. The Second Circuit neither held nor implied that a self-funded plan could never be damaged.
 
 
 48
 More importantly, it defies common sense to assert that the Delany Plan suffered no harm. Any plan which voluntarily parts with $160,000 has "less money available to pay benefits than it would have had without the commission of the alleged breach of fiduciary duty." Appellees' Brief at 19. Once a plan acquires assets, they are not to be expended imprudently. See, e.g., LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 207 (4th Cir.1984) (holding that a "trustee has the obligation to guard the assets of the trust from improper claims, as well as the obligation to pay legitimate claims"). Because the Plan paid $160,000 to cover part of a non-participant's medical bills, we reverse the magistrate judge's ruling that the Plan was not harmed.
 
 IV.
 
 49
 Continuing with the Selman I appeal, we next decide whether ERISA preempts Delany's garden-variety professional malpractice claim against Selman and BCS in their (non-fiduciary) capacities as insurance professionals. In light of the Supreme Court's recent (and narrowing) interpretation of the scope of ERISA preemption in New York State Conference of Blue Cross & Blue Shield Plans v. Travelers, 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), we hold that Delany's malpractice claim is not preempted because it does not "relate to" an employee benefit plan within the meaning of ERISA's preemption provision, 29 U.S.C. § 1144(a).[12]
 
 A.
 
 50
 By virtue of the Supremacy Clause, U.S. Const., Art. VI, Congress may by statute expressly preempt state law. Travelers, 514 U.S. at ----, 115 S.Ct. at 1676; see Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 203-04, 103 S.Ct. 1713, 1721-22, 75 L.Ed.2d 752 (1983). However, as the Supreme Court has made clear, courts never "assume[ ] lightly that Congress has derogated state regulation." Travelers, 514 U.S. at ----, 115 S.Ct. at 1676. Instead, courts "address claims of preemption with the starting presumption that Congress does not intend to supplant state law." Id.; see Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128-29, 68 L.Ed.2d 576 (1981). This is especially true in cases involving fields of traditional state regulation, including common law tort liability. See Travelers, 514 U.S. at ----, 115 S.Ct. at 1676. See also Cipollone v. Liggett Group, Inc., 505 U.S. 504, 518, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992); Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 740, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985); Custer v. Sweeney, 89 F.3d 1156, 1167 (4th Cir.1996).
 
 
 51
 With that presumption in mind we turn to the text of ERISA's preemption provision to discern Congress's intent. ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). This pronouncement is "clearly expansive" but not limitless. Travelers, 514 U.S. at ----, 115 S.Ct. at 1677. "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere.' " Id. (citation omitted). "[T]hat, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality." Id.
 
 
 52
 In Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), the Court explained that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Id. at 96-97, 103 S.Ct. at 2900. The Court cautioned, however, that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." Id. at 100 n. 21, 103 S.Ct. at 2901 n. 21. See also District of Columbia v. Greater Washington Bd. of Trade, 506 U.S. 125, 130 n. 1, 113 S.Ct. 580, 583 n. 1, 121 L.Ed.2d 513 (1992).
 
 
 53
 To determine whether a state law "relate[s] to" an ERISA plan, the Court in Travelers adopted a pragmatic approach. The Court went "beyond the unhelpful text [of § 1144(a) ] and the frustrating difficulty of defining its key term ["relates to"], and look[ed] instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive [preemption]." Travelers, 514 U.S. at ----, 115 S.Ct. at 1677.
 
 
 54
 The purpose of ERISA is to "protect ... the interests of participants in employee benefit plans and their beneficiaries, ... by establishing standards of conduct, responsibility, and obligation for fiduciaries ... and ... by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). Indeed, in passing ERISA's preemption provision, Congress intended
 
 
 55
 "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ... [and to prevent] the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction."
 
 
 56
 Travelers, 514 U.S. at ----, 115 S.Ct. at 1677 (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990)). In short, "the basic thrust of the preemption clause ... was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." Id. at ---- - ----, 115 S.Ct. at 1677-78.
 
 
 57
 The Court in Travelers noted that in light of the objectives of ERISA and its preemption clause, Congress intended ERISA to preempt at least three categories of state laws that can be said to have a connection with an ERISA plan.[13] First, Congress intended ERISA to preempt state laws that "mandate[ ] employee benefit structures or their administration." Id. at ----, 115 S.Ct. at 1678; Sweeney, 89 F.3d at 1167. For instance, the Court in Shaw held that ERISA preempted a New York statute that "prohibit[ed] employers from structuring benefit plans in a manner that discriminate[d] on the basis of pregnancy [and a second statute that] require[d] employers to pay employees specific benefits...." 463 U.S. at 97, 103 S.Ct. at 2900. ERISA preempted these laws because their "mandates affecting coverage could have been honored only by varying the subjects of a plan's benefits whenever New York law might have applied...." Travelers, 514 U.S. at ----, 115 S.Ct. at 1678. Thus, absent preemption, benefit plans would have been subjected to conflicting directives from one state to the next. See Shaw, 463 U.S. at 99, 103 S.Ct. at 2901.
 
 
 58
 Second, Congress intended to preempt state laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice, thereby functioning as a regulation of an ERISA plan itself. Travelers, 514 U.S. at ----, 115 S.Ct. at 1679. Accordingly, the Court in Travelers held that ERISA did not preempt New York's statute imposing surcharges on patients covered by certain insurers because the statute merely had an "indirect economic influence" on a plan's shopping choices but did not bind a plan to any particular choice. Id.
 
 
 59
 Third, in keeping with the purpose of ERISA's preemption clause, Congress intended to preempt "state laws providing alternate enforcement mechanisms" for employees to obtain ERISA plan benefits. Id. at ----, 115 S.Ct. at 1678; see Sweeney, 89 F.3d at 1167. Thus, the Court held in Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), that "[t]he common law causes of action raised in [the beneficiary's] complaint, each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre-emption under [§ 1144(a) ]." Id. at 48, 107 S.Ct. at 1553. Likewise, in Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), the Court concluded that ERISA preempted "a state common law claim that an employee was unlawfully discharged to prevent his attainment of benefits under a plan covered by ERISA." Id. at 135, 111 S.Ct. at 481.
 
 
 60
 By contrast, as we recently made clear, Congress did not intend to preempt "traditional state-based laws of general applicability [that do not] implicate the relations among the traditional ERISA plan entities," including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries. Sweeney, 89 F.3d at 1167 (internal quotation marks and alterations omitted). Thus, in Sweeney we held that ERISA does not preempt a state law legal malpractice claim asserted by a trustee of and participant in an ERISA plan against a lawyer who provided services for the plan. Id.
 
 
 61
 Our decision in Sweeney is consistent with decisions of other courts with respect to traditional state laws of general applicability. In Perkins v. Time Ins. Co., 898 F.2d 470 (5th Cir.1990), an employee sued his employer's group health insurer and its agent, alleging that the agent fraudulently induced him to surrender his old insurance coverage and participate in a new ERISA plan. The employee alleged that the agent falsely represented that the employee's daughter's eye surgery would be covered under the new plan. After his claim for coverage of the eye surgery was denied, the employee sued both the group health insurer and its agent. The court held that his claim against the group health insurer was preempted, but that the claim against the agent was not because "a claim that an insurance agent fraudulently induced an insured to surrender coverage under an existing policy, to participate in an ERISA plan which did not provide the promised coverage, 'relates to' that plan only indirectly." Id. at 473. The court reasoned that "[a] state law claim of that genre, which does not affect the relations among the principal ERISA entities (the employer, the plan fiduciaries, the plan, and the beneficiaries) as such, is not preempted by ERISA." Id. See also Perry v. P*I*E Nationwide, Inc., 872 F.2d 157 (6th Cir.1989) (ERISA does not preempt employees' state law claims against employer for misrepresentations made before employees joined plan), cert. denied, 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1068 (1990); Smith v. Cohen Benefit Group, Inc., 851 F.Supp. 210 (M.D.N.C.1993) (ERISA does not preempt employee's state law claim against plan administrator for misrepresentations about coverage that induced employee to join plan); DiPietro-Kay Corp. v. Interactive Benefits Corp., 825 F.Supp. 459 (D.Conn.1993) (ERISA does not preempt employer's misrepresentation claims against insurer from which it purchased benefits plan); Sexton v. Principal Fin. Group, 920 F.Supp. 169 (M.D.Ala.1996) (concluding that "there is some doubt" whether ERISA preempts employers' state law claims against insurer for fraudulent inducement to enter pooled group policy by misrepresenting who could participate in plan); Johnson v. Reserve Life Ins. Co., 761 F.Supp. 93 (C.D.Cal.1991) (employee's claim against insurance broker for negligent failure to procure replacement coverage not preempted).[14]B.
 
 
 62
 In light of these principles we now consider whether Delany's malpractice claim "relate[s] to any employee benefit plan." The gravamen of the claim is that the defendants, in their capacities as insurance professionals, negligently failed to obtain a replacement insurance plan for Delany that provided the same coverage and benefits as the Blue Cross policy.[15]
 
 
 63
 We begin by emphasizing that allowing Delany to pursue its malpractice claim "would not undermine the congressional policies that underlie ERISA." Sweeney, 89 F.3d at 1167. Permitting Delany's claim to go forward in no way threatens ERISA's objectives of "protect[ing] ... the interests of participants in employee benefit plans and their beneficiaries, ... by establishing standards of conduct, responsibility, and obligation for fiduciaries ... and ... by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). Allowing Delany's claim to survive is fully consistent with the purposes of ERISA's preemption provision. Delany's claim does not subject plan administrators and plan sponsors to "conflicting directives among States or between States and the Federal Government...." Travelers, 514 U.S. at ----, 115 S.Ct. at 1677 (quoting Ingersoll-Rand, 498 U.S. at 142, 111 S.Ct. at 484). Nor does it create "the potential for conflict in substantive law ... requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." Id. Delany's state law claim simply does not threaten Congress's goal of "nationally uniform administration of employee benefit plans." Id. at ---- - ----, 115 S.Ct. at 1677-78. Thus, a finding of preemption in this case is not necessary to protect the objectives of ERISA.
 
 
 64
 In light of this conclusion it should come as no surprise that the professional malpractice claim Delany asserts "does not fall within any of the categories of laws that courts have generally held to be preempted by ERISA." Sweeney, 89 F.3d at 1167. First, Virginia's common law of professional malpractice does not "mandate employee benefit structures or their administration." See Travelers, 514 U.S. at ----, 115 S.Ct. at 1678; Sweeney, 89 F.3d at 1167. The state law involved here does not regulate the terms of a plan or the type of benefits a plan may provide. It does not create reporting, disclosure or funding requirements. It does not affect calculation of benefits. Nor does it define fiduciary duties or address faulty plan administration.
 
 
 65
 Second, Virginia's professional malpractice law does not, either directly or indirectly, seek to bind a plan administrator to particular choices or preclude uniform administrative practice. See Travelers, 514 U.S. at ----, 115 S.Ct. at 1679. It thus cannot be said to function as a regulation of an ERISA plan itself. See id. Quite simply, Delany's claim is not aimed at a plan administrator at all since the defendants are sued in their capacities as insurance professionals for actions taken in that capacity. Indeed, defendants' malpractice, if any, took place before they began to act in their capacities as Plan Administrator and Plan Supervisor.
 
 
 66
 Third, Virginia's common law malpractice action is not an "alternate enforcement mechanism[ ]" for employees to obtain ERISA plan benefits. See id. at ----, 115 S.Ct. at 1678; Sweeney, 89 F.3d at 1167. Delany is not a beneficiary,[16] and Tyree was not a participant. Thus, it is necessarily the case that Delany's common law action cannot be considered an "alternate enforcement mechanism[ ]" for obtaining plan benefits. Moreover, the malpractice claim is not aimed at obtaining ERISA benefits. Rather, the claim seeks damages proximately caused by the insurance professionals' negligent failure to procure the promised replacement plan. If Delany prevails on its claim, the defendants will be liable in their individual capacities for their negligence as insurance professionals. See Smith v. Cohen Benefit Group, Inc., 851 F.Supp. 210, 214 (M.D.N.C.1993).
 
 
 67
 We believe that Delany's malpractice claim against insurance professionals is a "traditional state-based law[ ] of general applicability [that does not] implicate the relations among the traditional ERISA plan entities," including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries. Sweeney, 89 F.3d at 1167 (internal quotation marks and alterations omitted). See also Perkins, 898 F.2d at 473. There is no question that Delany's malpractice claim is rooted in a field of traditional state regulation. See Travelers, 514 U.S. at ----, 115 S.Ct. at 1678. Common law professional malpractice, along with other forms of tort liability, has historically been a state concern. Moreover, a common law professional malpractice claim is "a generally applicable [law] that makes no reference to, or functions irrespective of, the existence of an ERISA plan." Ingersoll-Rand, 498 U.S. at 139, 111 S.Ct. at 483. The state law at issue in this case imposes a duty of care on all professionals, including all insurance professionals. Common law imposes the duty of care regardless of whether the malpractice involves an ERISA plan or a run-of-the-mill automobile insurance policy. Thus, the duty of care does not depend on ERISA in any way. Finally, the state law malpractice claim does not affect relations among the principal ERISA entities. See Sweeney, 89 F.3d at 1167; Perkins, 898 F.2d at 473. Defendants' malpractice, if any, occurred before the faulty plan went into effect and before defendants began to act as Plan Administrator and Plan Supervisor. Accordingly, the claim is asserted by Delany, in its capacity as employer, against the defendants in their capacities as insurance professionals, not in their capacities as ERISA fiduciaries. It is irrelevant that Delany ultimately hired the defendants to serve as Plan Administrator and Plan Supervisor after they designed and sold the plan to Delany. The malpractice claim would still exist if Delany had hired someone other than the defendants to serve as Plan Administrator and Plan Supervisor.
 
 
 68
 Ingersoll-Rand does not compel a contrary result. In that case, the Supreme Court held that ERISA preempted a common law claim by an employee that he was wrongfully discharged to prevent his attainment of benefits under an ERISA plan. 498 U.S. at 140, 111 S.Ct. at 483-84. In reaching its decision, the Court noted that "the existence of a benefit plan is a critical factor in establishing liability under the State's wrongful discharge law." Id. at 139-40, 111 S.Ct. at 483. There simply was no cause of action in the absence of a plan. Id. at 140, 111 S.Ct. at 483-84. In addition, a court's inquiry would necessarily be "directed to the plan." Id.[17]
 
 
 69
 We recently made clear, however, that in Ingersoll-Rand the Court was particularly concerned "that permitting 'state based' wrongful discharge actions would subject plans and their sponsors to 'conflicting directives among States or between States and the Federal Government.' " Sweeney, 89 F.3d at 1167 (quoting Ingersoll-Rand, 498 U.S. at 142, 111 S.Ct. at 484). That concern, as we have explained, is not implicated in this case by Virginia's professional malpractice law. Moreover, the Court in Ingersoll-Rand emphasized that it was not dealing with "a generally applicable [law] that makes no reference to, or functions irrespective of, the existence of an ERISA plan." Id. at 139, 111 S.Ct. at 483. Here, by contrast, we have such a law.
 
 
 70
 In any event, we do not believe this is a case where "the existence of a benefit plan is a critical factor in establishing liability." See id. at 139-40, 111 S.Ct. at 483. The defendants' malpractice, if any, did not involve an existing ERISA plan. Instead, it involved the failure to procure the coverage and reinsurance protection Delany wanted. Quite simply, the existence of an ERISA plan cannot be critical to Delany's malpractice claim since a malpractice claim would still exist if the defendants had procured no plan at all. See Cohen Benefit Group, 851 F.Supp. at 213.
 
 
 71
 To be sure, resolution of Delany's malpractice claim will require an examination of certain provisions in the Delany Plan the defendants drafted and the Security policy the defendants procured. Thus, to some extent the court's inquiry will be "directed to the plan." See Ingersoll-Rand, 498 U.S. at 140, 111 S.Ct. at 483. However, we do not believe this factor carries much weight in this context. In considering Delany's claim, the court's inquiry will be centered on whether the defendants' conduct comported with the relevant professional standard of care. We think an analogous situation is a hypothetical case of lawyer malpractice. Suppose that a client hires a lawyer to file suit, claiming that the client is entitled to benefits under an ERISA plan. The lawyer agrees, but then allows all the applicable limitations periods to run. If the client sues the lawyer for malpractice, then to prevail on the malpractice claim, he will likely have to prove the terms of his ERISA plan. However, the (professional malpractice) law at issue will have nothing to do with ERISA. The case will turn on legal duties generated outside the ERISA context, and the malpractice claim should not be preempted. As with this hypothetical case of lawyer malpractice, Delany's claim, although it may require the court to examine some provisions of an ERISA plan, turns on duties generated by Virginia common law.
 
 
 72
 On the basis of the foregoing, we cannot say that the common law malpractice action at issue in this case "relate[s] to any employee benefit plan" within the meaning of 29 U.S.C. § 1144(a). Accordingly, we hold that ERISA does not preempt Delany's professional malpractice claim.[18]
 
 
 73
 Selman I is therefore remanded for further proceedings consistent with this opinion.
 
 V.
 
 74
 We now turn to Selman II and the magistrate judge's decision that the prior adjudication in Selman I barred Selman II. We hold that Selman II is not barred.
 
 
 75
 There are three elements necessary to apply the doctrine of res judicata: "(1) a judgment on the merits in a prior suit resolving (2) claims by the same parties or their privies, and (3) a subsequent suit based on the same cause of action." Aliff v. Joy Mfg. Co., 914 F.2d 39, 42 (4th Cir.1990). Because of our decision today, further proceedings will be necessary in Selman I on remand. Accordingly, there is not a final judgment on the merits in Selman I, and res judicata does not bar Selman II. See International Tel. & Tel. Corp. v. General Tel. & Elec., 527 F.2d 1162, 1163 (4th Cir.1975).[19] The judgment in Selman II is reversed, and the case is remanded for further proceedings consistent with this opinion.[20]
 
 VI.
 
 76
 Because there is substantial overlap between Selman I and Selman II, we believe the interests of judicial economy require that the cases be consolidated. Thus, we remand both cases with instructions to consolidate Selman I and Selman II. See International Tel. & Tel. Corp., 527 F.2d at 1163-64.
 
 
 77
 * * *
 
 No. 94-1676 is
 
 78
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.
 
 Nos. 95-1380 and 95-2241 are
 
 79
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 WILLIAMS, Circuit Judge, concurring:
 
 80
 I concur in the Majority's opinion, but write separately to underscore the limited holding of Part II. In Part II, we hold that Delany is "a fiduciary to the limited extent it exercised its discretionary responsibility 'to monitor appropriately' and remove the Plan Administrator and Plan Supervisor." Majority Op. at 1466 (emphasis added). Thus, because Delany exercised that responsibility, it has standing to bring this suit. In contrast, an employer who does not exercise its discretionary responsibility to monitor appointees does not have standing and has not exposed itself to open-ended liability. See Majority Op. at 1465-66 n. 10 (citing Newton v. Van Otterloo, 756 F.Supp. 1121, 1132 (N.D.Ind.1991) (holding that employer was not liable because nothing "put [it] on notice of possible misadventure by [its] appointees" )). This Circuit has been careful to shelter an employer's ability to make business decisions "for business reasons, notwithstanding their collateral effect on prospective, contingent employee benefits." Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1079 (4th Cir.), cert. denied, 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989). Today's decision does nothing to impair this general principle.
 
 
 
 [1]
 We sometimes refer to Selman and BCS collectively as "the defendants."
 
 
 [2]
 The magistrate judge heard the case by mutual consent of the parties. See 28 U.S.C. § 636(c)
 
 
 [3]
 Some of the magistrate judge's other rulings in Selman I were also appealed. We deal with these rulings in footnotes, as they become relevant to our analysis
 
 
 [4]
 The magistrate judge ruled that Tyree participated in the Plan. That was error. ERISA defines a "participant" as"any employee who is or may be eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). The Plan's active service requirement rendered Tyree ineligible for any benefits from the Plan's inception. And Tyree's poor health made it patently unreasonable to expect that he would return to covered employment any time in the foreseeable future. Thus, since Tyree was neither eligible for benefits nor reasonably likely ever to become eligible for benefits under the Plan, he was not a participant. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 117-18, 109 S.Ct. 948, 957-58, 103 L.Ed.2d 80 (1989)
 
 
 [5]
 The magistrate judge also said that "the plan that was put into effect, I find as a matter of law, is what they [Delany] were asking for." Delany appeals this conclusion, and we agree that it is erroneous. The evidence we have just canvassed, viewed for summary judgment purposes in the light most favorable to Delany, plainly supports the conclusion that the Plan tendered by the defendants was not in material respects what Delany asked for
 
 
 [6]
 Because the issue of standing under ERISA is jurisdictional in nature, we decide it first. See Alexander v. Anheuser-Busch Cos., Inc., 990 F.2d 536, 538 (10th Cir.1993)
 
 
 [7]
 The magistrate judge was told orally at the April 6, 1994, hearing, when he granted summary judgment in Selman I to the defendants, that Delany had become Plan Administrator and Supervisor five days earlier, on April 1, 1994
 
 
 [8]
 Under ERISA an employer that establishes or maintains an employee benefit plan is a "sponsor." 29 U.S.C. § 1002(16)(B)
 
 
 [9]
 The power to amend a plan includes the power to appoint, retain and remove plan fiduciaries. See Ed Miniat, Inc. v. Globe Life Ins. Group, Inc., 805 F.2d 732, 736 (7th Cir.1986), cert. denied, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987)
 
 
 [10]
 We reemphasize that "a party is a fiduciary only as to the activities which bring the person within the definition." Coleman, 969 F.2d at 61. Thus, we do not mean to suggest that the responsibility to monitor appointees exposes the appointing fiduciary to open-ended liability. On the contrary, courts have properly taken a restrictive view of the scope of this duty and its attendant potential for liability. See, e.g., Newton, 756 F.Supp. at 1132 (board members with power to appoint and remove plan fiduciaries not liable because nothing "put [them] on notice of possible misadventure by their appointees"). Here, of course, Delany removed Selman and BCS after it (Delany) obtained information leading it to believe that Selman and BCS had breached their fiduciary duties to the Plan
 
 
 [11]
 Harm is an element of a cognizable breach of fiduciary duty claim. See 29 U.S.C. § 1109(a)
 
 
 [12]
 The New York statute challenged in Travelers required hospitals to collect surcharges from patients covered by a commercial insurer but not from patients insured by a Blue Cross/Blue Shield plan. The statute also subjected certain health maintenance organizations (HMOs) to surcharges that varied depending on the number of Medicaid recipients an HMO enrolled. The surcharges were justified on the ground that Blue Cross had an open enrollment policy, meaning that it provided coverage for many subscribers whom commercial insurers would reject as unacceptable risks. The effect of the surcharges was to make Blue Cross more attractive as an insurance alternative. Travelers, 514 U.S. at ---- - ----, 115 S.Ct. at 1674-79. Reasoning that ERISA's preemption clause must be read expansively, the Second Circuit concluded that the surcharges "relate[d] to" ERISA plans because they purposefully interfered with the choices that ERISA plans made for health care coverage and therefore had an impermissible impact on ERISA plan structure and administration. Id. at ----, 115 S.Ct. at 1676. The Supreme Court reversed. Although the surcharges were intended to have an indirect economic effect on choices made by insurance purchasers, the Court concluded that ERISA did not preempt New York's statute because
 [a]n indirect economic influence [ ] does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself.... Nor does the indirect influence of the surcharges preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one.... It is an influence that can affect a plan's shopping decisions, but it does not affect the fact that any plan will shop for the best deal it can get, surcharges or no surcharges.
 Id. at ---- - ----, 115 S.Ct. at 1678-79.
 
 
 [13]
 Like the Court in Travelers we are not presented with state law that makes "reference to" an ERISA plan. To be preempted on this basis, a law must on its face "specifically refer" to ERISA plans. See Greater Washington Bd. of Trade, 506 U.S. at 130, 113 S.Ct. at 583-84
 
 
 [14]
 There are cases that have taken a contrary position. In Consolidated Beef Indus., Inc. v. New York Life Ins. Co., 949 F.2d 960 (8th Cir.1991), cert. denied, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992), an employer sued an insurance professional for misrepresentation and other claims stemming from the sale of an ERISA plan. The employer argued that its claim arose out of the purchase of the plan and was therefore not preempted. The court held that the employer's "claims, such as inaccurate billings, incorrect interest rates and lack of annual statements to plan participants, arise directly from the administration of the plan." Consolidated Beef, 949 F.2d at 964. In dicta the court said that "even if [the employer's] claims involved misrepresentation in the sale of the [plan], its claims still relate to the employee benefit plan." Id. (citing Farlow v. Union Cent. Life Ins. Co., 874 F.2d 791, 794 (11th Cir.1989)). Similarly, in Farlow beneficiaries under a plan sued an insurer and insurance agent alleging, among other things, misrepresentation and negligence arising from the sale of an insurance policy. The beneficiaries alleged that the insurance agent "misrepresented that the plan's coverage was co-extensive with the [beneficiaries'] former plan's coverage." Farlow, 874 F.2d at 794. The court rejected the argument that claims involving misconduct in the sale and implementation of a plan do not relate to the plan. The court decided that state law claims "not wholly remote in content from the [ ] plan" are preempted. Id. Applying this rule, the court held that the beneficiaries' claims were preempted. Id. See also Macomber v. Digital Equip. Corp., 865 F.Supp. 65 (D.N.H.1994) (former employee's claims alleging wrongful conduct prior to adoption of ERISA plan and seeking benefits under plan, or damages as measured by benefits which plan would have otherwise provided, are preempted)
 We decline the defendants' invitation to follow Consolidated Beef and Farlow. The courts in those cases relied heavily on what they regarded (at the time) as the Supreme Court's "expansive view of ERISA preemption." See Farlow, 874 F.2d at 794; Consolidated Beef, 949 F.2d at 963. Neither decision examined the preemption issue in light of Congress's objectives underlying ERISA's preemption provision. Both were decided prior to Travelers, a case which, we believe, signals a narrowing of the Court's view of ERISA preemption. Unlike some of the Court's other ERISA preemption decisions, Travelers emphasizes that we "address[ ] claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." See Travelers, 514 U.S. at ---- - ----, 115 S.Ct. at 1676-77. Moreover, the Court treated the phrase "relate to" more as a limitation on the scope of ERISA preemption than as a definition of its scope. See id. at ----, 115 S.Ct. at 1677. Thus, we find Consolidated Beef and Farlow unpersuasive today. Indeed, the Eleventh Circuit itself recently rejected the reasoning in Farlow. See Morstein v. National Ins. Serv., Inc., 93 F.3d 715, 722 (11th Cir.1996) (en banc) (holding that "when a state law claim brought against a non-ERISA entity does not affect relations among principal ERISA entities as such, then it is not preempted by ERISA. To the extent that any of our prior opinions differ from this holding, they should be deemed overruled.").
 
 
 [15]
 Although neither the parties nor the magistrate judge doubted that a viable malpractice claim would exist absent ERISA's preemption provision, we will briefly outline the state law at issue. It is now well established, in Virginia and elsewhere, that an insurance professional "owes a duty to his principal to exercise reasonable skill, care and diligence in effecting insurance. Thus, he may be held liable where he has breached a contract to procure insurance for his principal." 16A John Alan Appleman and Jean Appleman, Insurance Law and Practice § 8841 (1981); see Dickerson v. Conklin, 218 Va. 59, 235 S.E.2d 450 (1977) (acknowledging a cause of action for failure to obtain insurance); Standard Products Co., Inc. v. Wooldridge & Co., Ltd., 214 Va. 476, 201 S.E.2d 801 (1974) (acknowledging a cause of action for failure to obtain replacement insurance coverage). The claim is a sub-species of the general cause of action for professional malpractice, which may be brought against any professional who fails to exercise the knowledge, skill and care ordinarily employed by members of his profession. W. Page Keeton, et al., Prosser and Keeton on The Law of Torts § 32 (5th ed. 1984); see, e.g., H.C. Boone v. C. Arthur Weaver Co., Inc., 235 Va. 157, 365 S.E.2d 764 (1988) (malpractice claim against an accountant for giving erroneous advice); Comptroller of Virginia v. King, 217 Va. 751, 232 S.E.2d 895 (1977) (malpractice claim against an architect for a negligent design)
 
 
 [16]
 Under ERISA "the term 'beneficiary' means a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8)
 
 
 [17]
 The Court also ruled, in the alternative, that the beneficiary's claim was impliedly preempted because it conflicted directly with an ERISA cause of action spelled out in 29 U.S.C. § 1140. Ingersoll-Rand, 498 U.S. at 142, 111 S.Ct. at 484-85; see 29 U.S.C. § 1140 (prohibiting employers from terminating plan participants to prevent a pension from vesting)
 
 
 [18]
 Two other issues are raised on appeal in Selman I. First, we affirm the magistrate judge's decision to grant the defendants summary judgment on Delany's unjust enrichment claim. Neither Selman nor BCS was unjustly enriched. The defendants paid the money at issue to an innocent third-party, UVA. Moreover, ERISA provides remedies for a fiduciary's failure to prudently administer a plan in accordance with its foundation documents
 It is settled law in our circuit that " '[w]e are constrained to fashion only those [federal common law] remedies that are appropriate and necessary to effectuate the purposes of ERISA.' " Provident Life & Acc. Ins. Co. v. Waller, 906 F.2d 985, 993 (4th Cir.) (recognizing a federal common law claim in "the archetypal unjust enrichment scenario" where the defendant has been unjustly enriched and ERISA provides no appropriate remedy) (citing U.S. Steel Mining Co. v. District 17, United Mine Workers of America, 897 F.2d 149, 153 (4th Cir.1990)), cert. denied, 498 U.S. 982, 111 S.Ct. 512, 112 L.Ed.2d 524 (1990). Therefore, we affirm the magistrate judge's refusal to permit Delany to proceed on its unjust enrichment claim.
 Second, because we instruct the district court to consolidate Selman I and Selman II, we need not decide whether the magistrate judge abused his discretion in declining to permit Delany to amend its complaint to assert a request for a declaratory judgment concerning the remaining debt to UVA of $440,000.
 
 
 [19]
 We likewise hold that issue preclusion has no application here. Issue preclusion, like the doctrine of res judicata, applies only when the prior suit resulted in a final judgment. See Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980)
 
 
 [20]
 We decline to address the defendants' alternative arguments in Selman II that the new claims Delany asserted in Selman II are not cognizable as a matter of law. The magistrate judge did not consider these arguments because he relied on res judicata and issue preclusion principles. The magistrate judge should, on remand, consider the defendants' alternative arguments in the first instance